Dennis Lee CALDWELL *v.* STATE of Arkansas

CR 95-296                                910 S.W.2d 667

Supreme Court of Arkansas
Opinion delivered November 20, 1995

*Thomas D. Deen*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Dennis Lee Caldwell was convicted of first-degree murder, attempted rape, and burglary. He was sentenced to prison terms of life, thirty years, and twenty years, respectively. On appeal, he argues that the trial court erred (1) in failing to quash the jury venire; (2) in permitting the State to make a rebuttal argument during the sentencing phase; and (3) in refusing to give his proffered instruction on voluntary intoxication. The arguments are without merit, and we affirm the judgments.

On August 5, 1993, Keith Franklin was stabbed to death outside of his residence in Monticello. On the morning of August 7, 1993, Caldwell, who was at his parents' home in Crossett, was arrested by Crossett police officers. He made an oral confession to Officer Scott McCormick of the Crossett Police Department and said that he had stabbed "a fellow" in Monticello and thought that he had killed him but that he had been smoking crack cocaine for three days and did not know what he was doing. He told Officer Steve Sadler, also of the Crossett Police Depart-

ment, that he had smoked $400 to $500 worth of crack cocaine. That same morning, Caldwell was transported back to Monticello where he signed a written statement taken by Captain Charles Cater of the Monticello Police Department. That statement was introduced at trial and describes what occurred:

> On Thursday evening around 8:40 p.m., I walked up to Keith Franklin's house, I knocked on the door Mrs. Allison was there, I ask here if Keith was home, she said no. I left going in back toward the trailer I have been staying in, I saw Keith and Vickie Haynie setting in front of the house, Keith ask where I was going I told him I was going to get ready to go to work. I put on a pair of white warmups, and a rabbit shirt. I put the knife in my pocket. I walked around the park, I walked back to Winchester Rd. I saw Keith putting his bike in the house. I told him I would be at the back door, Keith came out the back door, we started talking. I pushed Keith he called me a big crack headed son-of-a-bitch. I close lined him and he fell. I got on top of him. I threatened him with the knife. He grabbed my arm. He was holding my arm. I drew back my other fist and he let go, when he turned loose of my arm, the knife came down & stuck him. I thought damn, I have done f..... up. Then I stuck him two more times, I got up off of him and went to the back door, I went inside to the kitchen, Mrs. Allison came into the kitchen, I grabbed her and tried to put a pillow case over her head, but she pulled it off. I was behind her I pushed her into the bedroom, onto the bed, I pulled her pants off. She said, I want to get my grandbaby. I went into the living room and got the baby's bottle, when I came back into the room she was crawling out the window. I took off, I jumped the fence & went toward the church. I crossed Oakland St. and went back by Vickie's house. There is a trail that leads to the trailer pk. I went to Antwaun's trailer. I caught a ride to work. I went on to work, about a hour later, someone told me Keith was dead. I ask my boss, if I could leave. I left and walked to James Bealer's house. I got with Wanda and Yvon her sister. We went back to Keith's house.

Viletha Allison, who was Keith Franklin's 63-year-old mother, confirmed the burglary and attempted rape in her testimony at

trial. She testified that she later found her son's wallet in a pillow case in the bedroom where the attempted rape occurred without any money in it.

A steak knife was seized from the trailer where Caldwell was living, and the blood scrapings from the knife matched the DNA profiles of the victim. Dr. Charles Kokes, a state medical examiner, testified at trial that the victim had 22 stab wounds to his neck, hands, chest, and left thigh and that he died of massive internal bleeding.

Caldwell was charged with capital murder and the death penalty was requested. He was found guilty of first-degree murder and sentenced to life imprisonment as well as to terms of years for attempted rape and burglary.

## I. JURY VENIRE

Caldwell first contends that the trial court erred in its failure to grant his motion to quash the venire because it was not made up solely of registered voters from the judicial district where the crime was committed. According to Caldwell, the Consent Decree entered by the United States District Court in *Hunt* v. *State*, No. PB-C-89-406 (Nov. 7, 1991), established new judicial districts which favored the election of minority judges and which also required that juries be selected from registered voters who lived in those new districts when crimes were committed there. The Franklin murder did occur in a new district, argues Caldwell, and yet only three jurors who were registered voters of the new district served on his jury. Under Caldwell's theory of the case, that runs directly contrary to Arkansas law and to the Sixth Amendment to the U.S. Constitution.

Article 7, section 13, of the Arkansas Constitution sets the parameters for the state's judicial districts, or circuits:

> The State shall be divided into convenient circuits, each circuit to be made up of contiguous counties, for each of which circuits a judge shall be elected, who, during his continuance in office, shall reside in and be a conservator of the peace within the circuit for which he shall have been elected.

Thus, under the plain meaning of the Constitution, the judicial

districts, or circuits, are to be framed along county lines and may include more than one county. The General Assembly has provided that each year "the prospective jurors for the following calendar year shall be selected from among the current list of registered voters of the applicable district or county. . . ." Ark. Code Ann. § 16-32-103(a) (Repl. 1994). Subsection (b) of § 16-32-103 states that the persons selected for jury duty shall come from registered voter lists for the district or county as provided by the county clerk.

The Consent Decree invoked by Caldwell in this appeal did have as its purpose "to provide African American voters improved and equal access to the political processes for electing judges to the trial courts of general jurisdiction in the State of Arkansas and to enhance the political participation and awareness of all citizens." The Consent Decree also states that the lines of existing judicial districts will not be disturbed by the remedy except to the extent that electoral subdistricts are created. The Decree then goes forward and creates "majority African American and majority white population electoral subdistricts in Judicial Districts One, Two, Six, Ten, and Eleven West. . . ." The Tenth Judicial District is at issue in the instant case. The General Assembly has designated its composition as Drew, Bradley, Ashley, Chicot, and Desha Counties. *See* Ark. Code Ann. § 16-13-1801 (Repl. 1994).

■ Whether the electoral subdistricts contemplated in the Consent Decree are judicial districts under our Constitution and statutes is an issue that has not been previously addressed in an opinion by this Court. In *Morgan* v. *State*, 273 Ark. 252, 618 S.W.2d 161 (1981), this court did consider whether the trial court erred in allowing the jury only to be drawn from one of the two judicial districts created in Sebastian County. We concluded that "[c]learly both our Constitution and the statute contemplate that a jury may properly be drawn from only one district within a county having more than one district." *Morgan*, 273 Ark at 255, 618 S.W.2d at 162. In *Morgan*, however, this court was analyzing Article 13, § 5, which expressly provides for two judicial districts in Sebastian County.

■ In the case at hand, there is no constitutional or legislative provision that divides the Tenth Judicial District into two

judicial districts. Added to this point is the fact that the language of the Consent Decree states that its remedy is directed at violations of the United States Voting Rights Act, and it specifically states that it "will not disturb existing district lines of the present judicial districts except to the extent that it creates electoral subdistricts. . . ." Other than inserting this new electoral district for the purposes of electing minority judges, no other aspects of the Tenth Judicial District were to be affected. According to the Consent Decree, the judges elected from the electoral subdistricts would exercise jurisdiction district-wide, and there was no requirement that each judge reside within the electoral district.

In an attempt to establish that legislative approval of the Consent Decree has occurred, Caldwell directs us to various appropriation measures passed by the General Assembly to fund the state judicial system. These measures do not evidence a directive by the General Assembly to subdivide the Tenth Judicial District but rather are funding mechanisms for the judges and judicial offices in both electoral subdistricts who exercise their authority throughout the judicial district. There simply has been no effort by the General Assembly to convert the electoral subdistricts into entirely separate and self-contained judicial districts with all the attendant ramifications. We hold that the electoral subdistricts within the Tenth Judicial District are not judicial districts and that the venire in this case was properly drawn from Drew County as a whole.

Finally, Caldwell maintains that he has a right under the Sixth Amendment to the U.S. Constitution to have the jurors selected from the electoral subdistrict where the crime was committed. The Sixth Amendment reads:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation. . . .

Caldwell provides us only with reference to the Sixth Amendment and with no additional authority. For the reasons stated above, we do not perceive the new subdistricts as having been created for reasons other than for the elections of minority judges. We

hold that the Tenth Judicial District remains intact under state law and that the state's judicial districts are the districts referenced in the Sixth Amendment as opposed to the electoral subdistricts established in the Consent Decree.

## II. REBUTTAL ARGUMENT

Caldwell next urges that he was prejudiced in the sentencing phase because the trial court permitted the State to rebut his closing argument. Caldwell argues strenuously that in the sentencing phase, there is no burden of proof on either the State or the defense and, as a consequence, the State is unduly favored by having had the last word in this instance.

■ When the issue before us was whether the State was entitled to any closing argument during the sentencing phase for habitual offenders, we stated:

> The appellant also argues that it was error to allow additional closing argument in the sentencing phase of the trial because it is not provided for in the statutory provision [Ark. Code Ann. § 5-4-202 (1987)] providing for sentencing procedure for habitual offenders. He maintains it prejudiced him because the prosecutor was able to argue punishment on both convictions. The appellant cites no authority for his contention beyond the language of Ark. Code Ann. § 5-4-502, which gives us no guidance. However, we find some analogy to the procedure in capital cases, *see* Ark. Code Ann. § 5-4-602 (1987), and that, coupled with the trial court's broad discretion in the management of trial proceedings generally, supports the conclusion there was no error.

*Beard* v. *State*, 306 Ark. 546, 553, 816 S.W.2d 860, 864 (1991).

■ Act 353 of 1993, which establishes new bifurcated sentencing procedures in criminal trials, contemplates that the State will introduce relevant evidence to the issue of sentencing, including prior convictions, delinquency adjudications, and aggravating circumstances, but it is also silent on the procedures for argument in the sentence phase at jury trials. *See* Ark. Code Ann. § 16-97-103 (Supp. 1993). The trial court followed the traditional format in criminal cases, where the State has the burden of proof, by allowing the State to present its closing argument,

the defense to respond, and the State to rebut. *See* Ark. Code Ann. § 16-89-123(a) (1987). As in *Beard* v. *State, supra*, permitting the State rebuttal argument in the sentencing phase when it has the burden of obtaining *some* penalty falls within the trial court's broad discretion in managing the trial. We hold that there was no abuse of that discretion in the procedure followed by the trial court in this regard.

### III. PROFFERED INSTRUCTION ON INTOXICATION

After the evidence presented during the guilt phase of the trial, Caldwell offered the following instruction which the trial court refused to give:

> Voluntary intoxication is not a defense. It may, however, be considered by you in determining whether or not Dennis Caldwell has the ability to form the specific intent [for] the offense charged.

Caldwell then proffered the instruction for purposes of this appeal.

By Act 101 of 1977, now codified at Ark. Code Ann. § 5-2-207 (Repl. 1993), the General Assembly eliminated self-induced intoxication as a defense in criminal prosecutions. We have recognized that voluntary intoxication is no longer a defense to criminal charges in a line of cases since the enactment of Act 101. *See, e.g., Sullinger* v. *State*, 310 Ark. 690, 840 S.W.2d 797 (1992); *Spohn* v. *State*, 310 Ark. 500, 837 S.W.2d 873 (1992); *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992); *Easter* v. *State*, 306 Ark. 615, 816 S.W.2d 602 (1991); *Cox* v. *State*, 305 Ark. 244, 808 S.W.2d 306 (1992); *White* v. *State*, 290 Ark. 130, 717 S.W.2d 784 (1986).

Contrary to Caldwell's assertion, § 5-2-207 does not eliminate the State's burden to prove purposeful intent to commit murder beyond a reasonable doubt, and the jury in his case was specifically instructed on the State's burden in this respect. We confronted this identical issue in *Sullinger* v. *State, supra*, also a first-degree murder case, where a due process violation was similarly raised. We referred in that opinion to § 5-2-207 and its constitutional soundness. We underscored that ample evidence of purposeful intent had been presented in the case in the form of two eyewitnesses who described how the defendant had shot the police officer. We also made reference to the evidence that

the defendant brought before the jury relating to his history of alcohol abuse. It was clear in *Sullinger* that the burden of proof remained with the State to prove purposeful intent and that the jury had determined that the State met its burden.

■ Here, Caldwell described his conduct in a statement given to Captain Cater of the Monticello Police Department. In that statement, Caldwell recounted in clear and lucid fashion the crimes he had perpetrated against Keith Franklin and Viletha Allison. There was no suggestion from any State witness, including the victim, Viletha Allison, that Caldwell's actions demonstrated anything other than intentional behavior. There was also evidence presented to the jury that Caldwell had been on a significant crack cocaine binge at the time of the crimes. Thus, the evidence relating to any element of purposeful intent was for the jury to weigh and evaluate in light of the State's burden to prove that intent beyond a reasonable doubt.[1] That is how the jury was instructed, and, as in *Sullinger* v. *State, supra*, it clearly found that the State met that burden.

■ Caldwell's proffered jury instruction is not an AMCI Instruction. Moreover, the instruction merely emphasizes Caldwell's theory of the case that his crack cocaine intoxication should be considered as diminishing his capacity to form purposeful intent. The trial court properly refused to give the instruction.

The record in this case has been examined in accordance with Supreme Court Rule 4-3(h), and no reversible error has been found.

Affirmed.

---

[1] The thrust of the State's case was capital felony murder and first-degree felony murder with robbery of Franklin as the underlying felony. The jury, however, was also instructed on purposefully causing the death of another and for that reason we address the issue of the proffered instruction in terms of purposeful murder.