Timothy Wayne KEMP *v.* STATE of Arkansas

CR 95-549 919 S.W.2d 943

Supreme Court of Arkansas
Opinion delivered April 22, 1996
[Petition for rehearing denied May 28, 1996.*]

*DUDLEY, J., not participating.

180

182

*Jeff Rosenzweig* and *Judy Rudd*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Sr. Appellate Advocate for appellee.

BRADLEY D. JESSON, Chief Justice. On October 4, 1993, police found the bodies of David Wayne Helton, Robert "Sonny" Phegley, Cheryl Phegley, and Richard "Bubba" Falls in a trailer on Highway 107 in Jacksonville. Each had been shot, and all but Falls had been shot more than once. Becky Mahoney, who had been hiding in a bedroom closet during the shootings, phoned 911. Shortly thereafter, her then-boyfriend, appellant Timothy Wayne Kemp, was arrested and charged with four counts of capital murder. He was convicted and sentenced to death by lethal injection on each count. He appeals from these convictions. We affirm the conviction and sentence pertaining to victim Falls, and affirm the convictions only as to the remaining three counts. We must reverse the death sentences as to these counts and remand for resentencing, as there was insufficient evidence to support the trial court's instruction to the jury with respect to the statutory aggravating circumstance that the murders were committed for the purpose of avoiding arrest.

### Sufficiency of the evidence

■ Appellant asserts that there was insufficient evidence of premeditation and deliberation to prove the four capital murder charges, particularly in light of the evidence presented that he acted in self-defense. When an appellant challenges the sufficiency of the evidence, we address that issue prior to all others. *Misskelley* v. *State*, 323 Ark. 449, 915 S.W.2d 702 (1996). The test for determining the sufficiency of the evidence is whether there is substantial evidence to support the jury's verdict. *Id.* Substantial evidence is that which is forceful enough to compel a conclusion one way or another and which goes beyond mere speculation or conjecture. *Id.*; *Davis* v. *State*, 317 Ark. 592, 879 S.W.2d 439 (1994). We review the evidence in the light most favorable to the appellee and consider only that evidence which supports the verdict. *Misskelley* v. *State, supra*; *Moore* v. *State*, 315 Ark. 131, 864 S.W.2d 863 (1993). Intent to commit murder may be inferred from the type of weapon used, and the nature, extent, and location of the wounds. *Dansby* v. *State*, 319 Ark. 506, 893 S.W.2d 331 (1995); *Allen* v. *State*, 310 Ark. 384, 838 S.W.2d 346 (1992).

The State elicited the following testimony at trial. Becky Mahoney, who had been living with appellant for eight years, testified that she and appellant were riding around in appellant's truck drinking beer on the date in question when they stopped at Wayne Helton's trailer to visit Helton and Sonny and Cheryl Phegley. Once inside, they all drank beer and danced as Sonny picked the guitar. Also present in the trailer was a man Becky knew only as "Bubba," who was later identified as Richard Falls. A couple of hours had passed before appellant became angry with Becky and asked her to leave with him. She refused, as she was scared of the appellant. After Cheryl asked appellant "two or three times" to leave, he complied. Becky became upset and planned to have Cheryl take her home because she was afraid appellant would return, and she didn't want any trouble.

Before Cheryl could take Becky home, someone knocked on the door. Becky "had a feeling" it was the appellant. As she was standing in the hallway between the kitchen and the living room, she heard a gun go off and saw "Bubba" fall. Cheryl then fell, yelling "oh, my God. Oh, my God." Becky then ran to a bedroom and hid in the closet. The gun kept going off. After the gunfire ceased, Becky left the closet and went into the living room, where

she saw three of the victims on the floor. She dialed 911, and while on the telephone, she "heard [appellant's] truck start up." She was positive it was the appellant's truck because she had been around it so long. While Becky estimated that she and the appellant had consumed approximately one case of beer apiece on the date in question, she did not consider the appellant "drunk," as it was not unusual for him to drink a lot of beer in the course of a day.

Officers arrived at the scene to find the bodies of the four victims, twelve spent .22 caliber shell casings, and a .32 caliber pistol. Based on Becky's description of the appellant and his truck, they located and arrested appellant at the residence of Bill Stuckey in Cabot. Officer David Adams testified that, after he orally advised appellant of his *Miranda* rights, appellant stated that "these people beat his ass and threatened him and he was just defending himself." Pursuant to a consent form signed by the appellant's mother, Lillie Kemp, officers searched her residence at 7710-D Swaggerty Road in Jacksonville, where appellant and Becky also resided. A box of ammunition and a blue shirt were retrieved from appellant's bedroom. Pursuant to appellant's written consent, officers recovered a .22 Ruger semi-automatic rifle in Lillie Kemp's closet and a box of .22 Remington shells in the front seat of appellant's vehicle.

Bill Stuckey testified that he had been appellant's best friend for some seven or eight years. Appellant and Becky dropped by his residence during the afternoon hours of October 4 and stayed approximately one hour. According to Stuckey, appellant returned to his home and awakened him at approximately 2:00 a.m., asking to borrow $20.00 for gasoline. Appellant was going to leave town and told Stuckey that he had shot Helton and some other people at Helton's residence, including the two Phegleys and another man he did not know. Appellant told Stuckey that "the other guy was just in the wrong place at the wrong time." Appellant stated that the people in the trailer ran him off, kept Becky at the trailer, and would not let her leave with him. Appellant then went home, got his gun, went back to the trailer, and shot them. Particularly, appellant told Stuckey that he had parked down the road behind the store and walked up through the woods about 50 yards to the porch of the trailer. Appellant knocked on the door, and when Helton answered, appellant shot him. Appellant then went in and shot the other people. When Cheryl tried to go down the hallway to one of the bedrooms, he followed her down the hall and shot her again,

assuring her that, "yes, she was going to die." Appellant told Stuckey that Cheryl had started all the argument, and that he could "hear [the victims] gasping for breath as he was leaving." It was Stuckey's testimony that appellant was drinking when he came to his trailer, but was not "knee-walking" drunk, as he had seen him drunk before. Stuckey clarified that he had no trouble understanding appellant, who was confused because he could not find Becky.

Dr. Frank Peretti, a forensic pathologist with the State Crime Lab, performed autopsies on all four victims. He observed five gunshot wounds on Cheryl's body, which included wounds to the right scalp, left arm, left midback, and left fifth finger. According to Dr. Peretti, either the wound to the arm or back could have killed her. Richard Falls died from a single gunshot wound to the right chest. On Robert Phegley's body, Dr. Peretti observed wounds to the head and left arm. As Robert would have died from the head wound alone, the wound to the arm, according to Dr. Peretti, was defensive in type and the first wound sustained, as Robert could not have raised his arm if he had been initially shot in the head. Finally, Dr. Peretti opined that Wayne Helton could have died from any of four gunshot wounds he sustained to the right upper chest, right mid chest, right forehead, and left lip. Regarding the lip wound, there was evidence of close range firing, estimated at one-quarter to one-half inch, due to the presence of soot around the wound. The wound to the right forehead also exhibited evidence of close-range firing, and the trajectory of this wound was consistent with Helton being on his back when the bullet was delivered.

Ronald Andrejack, a firearms expert with the State Crime Lab, testified that the bullets recovered from the bodies of both Phegleys and Richard Falls were fired from the .22 Ruger rifle recovered from appellant's residence. All twelve of the .22 caliber shell casings retrieved from the trailer were Remingtons, the same brand located in appellant's vehicle.

When considering Dr. Peretti's testimony regarding the nature, extent, and location of the victim's wounds, the jury could have easily inferred that appellant fired the shots into the victims in a premeditated and deliberated manner. Also significant was Bill Stuckey's testimony that appellant admitted to killing three of the victims because he was angry at them for running him off and not letting Becky leave with him, and a fourth because he was "at the wrong place at the wrong time." In light of this evidence, the State's

proof was sufficient that the appellant's killings of the four victims were premeditated and deliberate acts.

*Hunt Decree*

Appellant argues that his case was not properly triable in the First Division of the Pulaski County Circuit Court. Asserting that the Consent Decree entered by the United States District Court in *Hunt v. State*, No. PB-C-89-406 (Nov. 7, 1991), divided the Sixth Judicial District (Pulaski and Perry Counties) into two separate judicial districts, he claims that the murders occurred outside the area from which First Division Circuit Judge Marion Humphrey was elected; therefore, Judge Humphrey was without territorial jurisdiction to hear his case.

■ Very recently, in *State v. Webb*, 323 Ark. 80, 87-A, 913 S.W.2d 259, 261 (1996) (supplemental opinion denying rehearing), a case involving the territorial jurisdiction of municipal courts, we reviewed the law on this subject as follows:

> If the allegation of a charging instrument were that an offense occurred outside the territorial jurisdiction of the court, then a judgment rendered by the court would be void. *Waddle v. Sargent*, 313 Ark. 539, 855 S.W.2d 919 (1993); *Williams v. Reutzel*, 60 Ark. 155, 29 S.W. 374 (1895); RESTATEMENT (SECOND) OF JUDGMENTS § 4 (1982).

> The law in this State is that a criminal trial must be held in the county in which the crime was committed, provided that venue may be changed, at the request of the accused, to another county in the judicial district in which the "indictment is found." Ark. Const. art. 2, § 10; *Waddle v. Sargent, supra.* These authorities limit a circuit court to trying a criminal case in the county in which the crime was committed unless the accused requests the trial be moved to another county which, in any case, must be a part of the judicial district served by the court.

> [O]ur circuit courts are thus limited to trying accusations of crimes which occurred in the counties, or judicial districts, in which they sit . . . .

323 Ark. 80 at 83. In *Caldwell v. State*, 322 Ark. 543, 910 S.W.2d 667 (1995), we addressed, for the first time, whether the electoral

subdistricts contemplated in the *Hunt* Consent Decree are judicial districts under our Constitution and statutes. Appellant Caldwell, convicted of first-degree murder, argued that the jury venire in his case should have been quashed because it was not made up solely of registered voters from the judicial district where the crime was committed. According to Caldwell, the *Hunt* Decree, while establishing new judicial districts favoring the election of minority judges, also required that juries be selected from registered voters who lived in these new districts when crimes were committed there. Caldwell further argued that while the offense was committed in a new district, only three jurors who were registered voters of the new district served on his jury, which violated Arkansas law and the Sixth Amendment to the United States Constitution. In rejecting Caldwell's argument, we stated:

> The Consent Decree invoked by Caldwell in this appeal did have as its purpose "to provide African American voters improved and equal access to the political processes for electing judges to the trial courts of general jurisdiction in the State of Arkansas and to enhance the political participation and awareness of all citizens." The Consent Decree also states that the lines of existing judicial districts will not be disturbed by the remedy except to the extent that electoral subdistricts are created. The Decree then goes forward and creates "majority African American and majority white population electoral subdistricts in Judicial Districts One, Two, Six, Ten, and Eleven West . . . ."
>
> . . . .
>
> In the case at hand, there is no constitutional or legislative provision that divides the Tenth Judicial District into two judicial districts. Added to this point is the fact that the language of the Consent Decree states that its remedy is directed at violations of the United States Voting Rights Act, and it specifically states that it "will not disturb existing district lines of the present judicial districts except to the extent that it creates electoral subdistricts . . . ." Other than inserting this new electoral district for the purposes of electing minority judges, no other aspects of the Tenth Judicial District were to be affected. According to the Consent Decree, the judges elected from the electoral subdistricts would exercise jurisdiction district-wide, and there was no

requirement that each judge reside within the electoral district.

322 Ark. 543 at 548-549.

■ In this case, the appellant argues that, under the Arkansas Constitution, the "defining characteristic of a circuit judge" is that he or she be chosen by all and not merely some of the qualified electors of the judicial district in which he or she is to preside. In support of this argument, appellant cites Ark. Const. art. 7, § 17, which states:

> The judges of the circuit court shall be elected by the qualified electors of the several circuits, and shall hold their offices for a term of four years.

As we recognized with respect to the Tenth Judicial District in *Caldwell*, there is no constitutional or legislative provision that divides the Sixth Judicial District into two judicial districts. We see nothing in the plain language of Ark. Const. art. 7, § 17, that effects such a division.

■■ Appellant further relies on our decision in *Riviere* v. *Hardegree*, 278 Ark. 167, 644 S.W.2d 276 (1983). In that case, we considered whether the General Assembly, in passing Act 432 of 1977, had created one or two separate judicial circuits to serve the area of Garland, Polk, and Montgomery counties. The Act stated that one circuit, Eighteenth Circuit—East, would be composed of Garland County, and the other, Eighteenth Circuit—West, would be composed of Polk and Montgomery counties. However, in a separate act, the General Assembly had made an appropriation for only one prosecuting attorney. Adhering to the "plain-meaning rule" of statutory interpretation, we held that the clear language of the Act created two circuits, and that Ark. Const. art. 7, § 24,[1] plainly requires each circuit to have an office of prosecuting attorney. *Riviere* is distinguishable, as it involved statutory interpretation of an act of the General Assembly. We recognized in *Caldwell* that

> [t]here simply has been no effort by the General Assembly to

---

[1] This provision provides that: "The qualified electors of each circuit shall elect a prosecuting attorney, who shall hold his office for the term of two years, and he shall be a citizen of the United States, learned in the law, and a resident of the circuit for which he may be elected."

> convert the electoral subdistricts [created in *Hunt*] into entirely separate and self-contained judicial districts with all the attendant ramifications. We hold that the electoral subdistricts within the Tenth Judicial District are not judicial districts and that the venire in this case was properly drawn from Drew County as a whole.

322 Ark. 543 at 549. Appellant also maintains in his opening brief that his Sixth Amendment rights were violated by his prosecution in the First Division of Pulaski County Circuit Court. Similarly, the appellant in *Caldwell* maintained that he had a Sixth Amendment[2] right to have the jurors in his case selected from the electoral subdistrict where the crime was committed. In rejecting Caldwell's claim, we reasoned that

> we do not perceive the new subdistricts as having been created for reasons other than for the elections of minority judges. We hold that the Tenth Judicial District remains intact under state law and that the state's judicial districts are the districts referenced in the Sixth Amendment as opposed to the electoral subdistricts established in the Consent Decree.

*Id.* at 549-550. (Emphasis added.) In sum, we see no reason to depart from our recent decision in *Caldwell,* and conclude that territorial jurisdiction was proper in this case.

### Proffered instructions on "imperfect" self-defense

■ Appellant next asserts that the trial court erred in refusing his proffered instructions on what he terms "imperfect self defense." Neither of appellant's proffered instructions is an AMCI Instruction. We can easily dispose of appellant's argument as to one of these instructions, which reads as follows:

> When a person believes that the use of force is necessary in defense of himself but that person is reckless or negligent either in forming that belief or in employing an

---

[2] The Sixth Amendment reads:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . .

excessive degree of physical force, the defense of justification — use of deadly physical force in self-defense — is unavailable as a defense to any offense for which recklessness or negligence suffices to establish culpability.

Source: Ark. Code Ann. § 5-2-614.

While appellant contends that this instruction is an accurate statement of the law as found in Ark. Code Ann. § 5-2-614 (Repl. 1993), the instruction omits the phrase "is necessary for any of the purposes justifying that use of force under this subchapter," which appears in § 5-2-614(a). Thus, because appellant's proffered instruction did not correctly state the law, the trial court did not err in refusing to give it. *See Pickett* v. *State*, 321 Ark. 224, 902 S.W.2d 208 (1995).

■ Appellant also proffered the following instruction based on Ark. Code Ann. § 5-2-206(d) (Repl. 1993), regarding ignorance or mistake:

It is a defense to a prosecution that Timothy Wayne Kemp acted under a mistaken belief of fact that he was justified in using deadly physical force in self defense.

Although mistake of fact would otherwise afford a defense to the offense charged, the defense is not available if the defendant would be guilty of another offense had the situation been as he supposed. In such case, however, the mistake of fact of the defendant shall reduce the class or degree of the offense of which he may be convicted to those of the offense he would be guilty of had the situation been as he supposed.

Source: Ark. Code Ann. § 5-2-206.

While the trial court did instruct the jury as to self-defense, appellant asserts that his federal and state due-process rights were violated as a result of the trial court's refusal to give his proffered "imperfect self-defense" instruction. We do not agree. Appellant's proffered instruction merely emphasizes his theory of the case that his intoxication should be considered as diminishing his capacity to form the requisite intent to commit capital murder. *See Caldwell* v. *State, supra.* Yet the trial court's refusal to give appellant's requested instruction did not eliminate the State's burden to prove premeditated and deliberated murder beyond a reasonable doubt. The jury

was instructed in this respect, and was also instructed on the lesser-included offenses of first-degree murder, second-degree murder, and manslaughter. In short, the evidence relating to the element of premeditated and deliberated murder was for the jury to weigh and evaluate in light of the State's burden to prove that intent beyond a reasonable doubt. As it is clear that this burden remained with the State, we cannot agree that the trial court's refusal to give appellant's proffered instruction violated his due-process rights.

*For-cause challenges*

Appellant contends that his federal and state due-process rights were violated when the trial court refused to strike certain potential jurors for cause, namely Annette Waters, Larry Cheatham, Cecilia Baca, Carol Stroman, Catherine Dumas, Felix Clark, Billy Trimble, and Ray Keech. He asserts that he was forced to "waste" peremptory challenges on these persons.

■ The standard for determining if a prospective juror should be excused for cause is whether the juror's views about the death penalty would prevent, or substantially impair, the performance of the juror's duties in accordance with the instructions and the oath taken. *Nooner* v. *State*, 322 Ark. 87, 907 S.W.2d 677 (1995). A claim of error relating to a challenge for cause is only preserved regarding jurors who actually sat on the jury after a challenge for cause was denied. *Franklin* v. *State*, 314 Ark. 329, 863 S.W.2d 268 (1993); *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990), *cert. denied*, 497 U.S. 1011 (1990), *citing Ross* v. *Oklahoma*, 487 U.S. 81 (1988). In Arkansas, it is presumed that persons comprising the venire are unbiased and qualified to serve. *Franklin* v. *State*, *supra*, *citing Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984). It was appellant's burden to prove otherwise. *Id*. We will not disturb a trial court's ruling on this issue absent an abuse of discretion. *Id*.; *Butler* v. *State*, 303 Ark. 380, 797 S.W.2d 435 (1990).

In this case, only one potential juror, Judy Cook, was seated after appellant's peremptory strikes were exhausted and his challenge for cause denied. In his brief, appellant merely states that he challenged Cook on "a totality of the circumstances" test, and that he identified her as one against whom he would have exercised a peremptory challenge had he had one remaining.

During voir dire, when initially questioned by the deputy

prosecutor whether she thought there were cases where the death penalty was a proper punishment, Ms. Cook responded that, in a capital murder trial, if the accused is guilty beyond any doubt, the death penalty would be proper. After the prosecutor explained that the State had the burden of proving aggravating circumstances during the separate penalty phase, Ms. Cook stated that she understood that at the end of the guilt phase, the death penalty could not be imposed unless and until the State puts on further proof. She stated she understood that the defendant was not required to put on any proof at all, and that she could be an impartial, fair juror and follow the law as given to her by the trial court.

During appellant's questioning of Ms. Cook, she responded that she had no problem with the fact that the evidence in the case would deal with the use or abuse of alcohol, and stated that the knowledge that alcohol was involved did not cause her to feel prejudiced toward either party. Regarding the death penalty, Ms. Cook stated that her opinion had background from the Old Testament, particularly the book of Exodus, "where you have to make equal recompense for whatever your offense was," and from obedience to civil laws. She specifically stated that if a case were fully planned and premeditated, she would not automatically be for the death penalty, as "[i]t would have to meet all the rules. I mean whatever rules were given or set down, it would have to meet all those circumstances." She further stated that she did not think she would be leaning toward the death penalty in such a case, and that "it would be up to the State to prove" that a person should receive the death penalty. She concluded that both life without parole and the death penalty were very harsh punishments. When examining Ms. Cook's remarks, we agree that her answers did not render her unfit to serve on the jury. Thus, we reject appellant's argument on this point.

### Overlap of offenses

Next, appellant argues that the capital murder statute is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments because it provides no meaningful distinction between "premeditation and deliberation" and the definition of "purpose" in the first-degree murder statute. We have rejected this argument on several occasions. *See e.g., Nooner* v. *State, supra; Dansby* v. *State, supra; Sheridan* v. *State,* 313 Ark. 23, 852 S.W.2d 772

(1993); *Ward* v. *State*, 308 Ark. 415, 827 S.W.2d 110, *cert. denied*, 506 Ark. 841 (1992).

### Prosecutor's closing argument

Appellant alleges that the trial court erred in denying his motion for mistrial after the deputy prosecutor made an improper remark during closing arguments in the guilt-innocence phase of the trial. The remark at issue is as follows:

> Wayne Helton is shot twice in the body and he's going to die from those gunshot wounds. And I know that his family, when they heard Dr. Peretti testify, they just prayed he was already dead . . .

Appellant objected to the remark, and counsel for both parties approached the bench. He argued that it was improper for the prosecutor to refer to the reaction of someone who may or may not have been in the audience, especially when he had agreed to allow the family members to remain in the courtroom as a courtesy. Appellant requested a mistrial and without waiving this request, asked the trial court to admonish the jury to disregard the comment. The trial court denied the motion to mistrial, but admonished the jury as follows:

> The jury is instructed to disregard references to feelings of persons where there is no evidence before this Court through testimony and exhibits.

On appeal, appellant argues that this admonition was insufficient to cure the prejudice caused by the prosecutor's blatantly improper argument. In support of his position, he cites *Timmons* v. *State*, 286 Ark. 42, 688 S.W.2d 944 (1985). *Timmons* is clearly distinguishable. In that case, the prosecutor called a witness to the stand when he knew that the witness could not give valid, relevant testimony, and then argued that it was the appellant who prevented the jury from hearing the evidence. The prosecutor had earlier admitted that the witness, a forensic serologist from the state crime lab, could not connect the chain of custody about the materials she had examined in appellant's rape case. The prosecutor's "desire for success" caused him to use improper strategy to try to obtain the appellant's conviction. *Id*. at 44.

Here, the prosecutor's statement was not of such

magnitude to require a mistrial. A mistrial is a drastic remedy to which the court should resort only when there has been an error so prejudicial that justice cannot be served by continuing the trial; it should only be ordered when the fundamental fairness of the trial itself has been manifestly affected. *King* v. *State*, 317 Ark. 293, 877 S.W.2d 583 (1994). The trial court has wide discretion in granting or denying a motion for a mistrial and its discretion will not be disturbed except where there is an abuse of discretion or manifest prejudice to the complaining party. *Id*. An admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Id*. Recently, we reiterated that attorneys are given leeway in closing remarks. *Bowen* v. *State*, 322 Ark. 483, 906 S.W.2d 681 (1995). Moreover, the trial court instructed the jury that closing arguments were not evidence. In this case, we conclude that the admonition cured any prejudice.

### Other guilt-innocence-phase objections

In addition to the allegations of error discussed above, appellant presents brief arguments in support of six other assignments of error which he claims occurred during the guilt-innocence phase of his trial. First, he claims that the trial court refused to suppress the oral statement he made to Officer David Adams that the victims "beat his ass and threatened him and he was just defending himself." His argument is that, since he had consumed at least a case of beer in the eight to twelve hours prior to offering this statement, he was so intoxicated that he did not knowingly, intelligently, and voluntarily waive his rights under the Fifth Amendment to the United States Constitution and Ark. Const. art. 2, § 8. We have held that, whether an accused had sufficient mental capacity to waive his constitutional rights, or was too incapacitated due to drugs or alcohol to make an intelligent waiver is a question of fact for the trial court to resolve. *Phillips* v. *State*, 321 Ark. 160, 900 S.W.2d 526 (1995). The fact that the accused might have been intoxicated at the time of his statement, alone, will not invalidate that statement, but will only go to the weight accorded it. *Id*. Thus, appellant's argument is meritless. Appellant makes similar objections in favor of suppression of the box of .22 Remington shells seized from his truck. Likewise, appellant's argument that he was too intoxicated to make an intelligent waiver to the search of his vehicle goes to weight rather than admissibility.

 Appellant further argues that the trial court erred in refusing to enjoin the prosecutor from claiming to represent "The People," as Arkansas has specifically rejected this formulation and prosecutions are made in name of the State. Appellant cites no authority nor makes a convincing argument in support of his assertion of error. Moreover, we can see no prejudice in the trial court's failure to so enjoin the prosecutor, and will not reverse in the absence of prejudice. *Misskelley* v. *State, supra; citing Berna* v. *State,* 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied,* 470 U.S. 1085 (1985).

 Prior to individual voir dire, the prospective jurors were asked some questions as a group. One prospective juror, Dewey Harvey, stated that his wife worked with someone who was related to one of the witnesses, particularly, "the girl that was hid in the closet," obviously referring to Becky Mahoney. Appellant moved to quash the panel on the grounds that this statement was prejudicial. The prosecutor responded that since there would be testimony that Becky hid in the closet, the panel did not hear anything that they would not hear if Harvey were selected as a juror. The trial court denied the motion to quash. At trial, Becky Mahoney testified that she hid in a closet in the trailer during the shootings. Again, the appellant cannot show he was prejudiced by the trial court's ruling. *Id.*

 The trial court also denied appellant's motion for mistrial, which was based on the following remark made by the prosecutor during closing arguments:

> If you find an instruction in there that says intoxication is a defense to the slaughter that this man committed in this trailer that night, then you find him guilty of . . . .

Appellant argued that he had not stated that intoxication was a defense; rather, he had argued "the mental state." According to appellant, the prosecutor's remarks were so misleading that a mistrial should be declared. The trial court denied the motion for mistrial, and refused appellant's request to admonish the jury. While appellant cites no authority for this allegation of error, he asserts that the "greater prejudice" resulted from the denial of his requested "imperfect self-defense" instructions. As discussed above, we rejected appellant's allegation of error concerning the trial court's denial of his proffered instructions. Regarding the deputy prosecu-

tor's argument here, we repeat that leeway is given to both sides during closing argument. *See Bowen v. State, supra.* The prosecutor was simply arguing her case to the jury. We conclude that the trial court did not abuse its discretion in denying appellant's motion for mistrial. *King v. State, supra.*

### *"Avoiding arrest" aggravating circumstance*

■ We now consider the assignments of error involving the penalty phase. Appellant argues that there was insufficient evidence of the aggravating circumstance that the murders were committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody as set forth in Ark. Code Ann. § 5-4-604 (5)(Repl. 1993). On appeal, we review the sufficiency of the State's evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Coulter v. State,* 304 Ark. 527, 533, 804 S.W.2d 348, 351-52, *cert. denied,* 502 U.S. 829 (1991) (citing *Lewis v. Jeffers,* 497 U.S. 764, 780-82 (1990)). Whenever there is any evidence of an aggravating or mitigating circumstance, however slight, we have held that the matter should be submitted to the jury for consideration. *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430, *cert. denied* 450 U.S. 1035 (1981).

■ At least one commentator has recognized that the statutory aggravating circumstance at issue is "apparently designed to deter deliberate murderous acts subversive of the criminal justice system in particular and social order in general, and to protect certain persons deemed especially important to the integrity of both, including law enforcement officers, prison guards, and actual or potential witnesses in judicial proceedings." *See* Thomas M. Fleming, Annotation: *Sufficiency of the Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Committed to Avoid Arrest or Prosecution, to Effect Escape from Custody, to Hinder Governmental Function or Enforcement of Law, and the Like — Post-Gregg Cases,* 64 A.L.R.4th 755, 763 (1988 and Supp. 1995)(footnotes omitted). Many courts, according to this commentator, follow the rule that, where the victim is not a law-enforcement officer, the State must clearly show that prevention of detection and arrest for the offense was the dominant or only motive for the killing. *Id.* at 766 (footnotes omitted).

■ We recognize that a consequence of every murder is the

elimination of the victim as a potential witness. However, avoiding arrest is not necessarily an invariable motivation for killing. *See Whitmore* v. *Lockhart,* 834 F. Supp. 1105 (E.D. Ark. 1992), *aff'd* 8 F.3d 614 (8th Cir. 1993). A common thread in many of our prior decisions involving the "avoiding arrest" aggravating circumstance is that the murder was committed in order to avoid arrest or eliminate a witness to another offense committed in connection with the murder. *See e.g., Porter* v. *State,* 321 Ark. 555, 905 S.W.2d 835 (1995)(the jury could have found beyond a reasonable doubt that appellant killed victim to avoid being arrested for robbery due to nature of victim's head wound and the fact that appellant had spoken to victim, who could have identified him as one of the robbers); *Coulter* v. *State, supra* (child victim obviously knew appellant and would have been able to identify him as the man who raped her; the ends to which appellant went in trying to hide the body, coupled with his almost immediate departure from the area where the offense occurred, was clear evidence of his other efforts to avoid arrest); *Wainwright* v. *State,* 302 Ark. 371, 790 S.W.2d 420, *cert. denied* 499 U.S. 913 (1990)(sufficient evidence presented where appellant had prior dealings with the victim, and knowing his name, the victim could have identified appellant as having committed the robbery); *Pickens* v. *State,* 292 Ark. 362, 730 S.W.2d 230, *cert. denied* 484 U.S. 917 (1987)(overwhelming evidence that appellant and his accomplices intended to kill their victims in order to avoid identification, apprehension, arrest and conviction for the robbery where they fatally shot a store customer during the robbery and wounded several other people as they lay helplessly on the floor; one of the surviving victims testified that after appellant was told there was no place in the store in which the victims could be locked up, the robbers commented that they would have to "do away" with the victims because "if they get loose they'll burn us"); *Hill* v. *State,* 278 Ark. 194, 644 S.W.2d 282 (1983)(the jury was justified in finding that petitioner shot victims Teague and Ward to increase his chances of avoiding arrest after he had robbed Ward's service station); *Miller* v. *State, supra* (sufficient evidence that appellant killed the deceased to eliminate a witness and thus hopefully avoid arrest for robbery where he confessed that immediately prior to the shooting, thoughts of being identified by the victim ran through his mind, and no evidence was discovered to corroborate appellant's explanation that he shot the victim because the latter reached for an iron pipe). In at least one case, the victim had

knowledge regarding an offense not committed in connection with the murder. *Sheridan* v. *State, supra* (overwhelming evidence that appellant killed the victim because she had informed narcotics agents that he was involved in drugs).

The Attorney General asserts that, based on Bill Stuckey's testimony, the jury could have inferred that appellant returned to Helton's trailer for the purpose of retrieving his girl-friend, Becky Mahoney, and that he shot and killed the four victims at issue in order to prevent them from having him arrested if he used force to remove Mahoney from the trailer. To accept the State's argument would require an exercise in speculation as to appellant's motive and is contrary to Stuckey's testimony during the penalty phase:

> DEPUTY PROSECUTOR: Did he tell you who he shot?
>
> WITNESS: Yes ma'am.
>
> DEPUTY PROSECUTOR: Whom did he shoot?
>
> WITNESS: Wayne and Sonny and Cheryl and some guy that he didn't know.
>
> DEPUTY PROSECUTOR: Okay. Specifically with reference to the guy he didn't know, did he make any comments about that particular person?
>
> WITNESS: Yeah. He said that he was in the wrong place at the wrong time.
>
> DEPUTY PROSECUTOR: Did he give you any particular reason for shooting these people?
>
> WITNESS: Yes.
>
> DEPUTY PROSECUTOR: What was that?
>
> WITNESS: That they had run him off and kept Becky and wouldn't let him take Becky with him.
>
> DEPUTY PROSECUTOR: Was he looking for Becky?
>
> WITNESS: Yes.

In addition to the quoted passage, our review of the record reveals no testimony at trial, from Stuckey, Mahoney, or any other witness, that appellant made any attempt to forcibly remove Mahoney from

the trailer, or that he shot and killed the four victims in order to prevent them from having him arrested if he used force to remove Mahoney from the trailer. Moreover, the State's argument contains an obvious flaw — the appellant never used force to remove Mahoney from the trailer, thus the killings could not have been committed to avoid being arrested for an offense that did not occur. To accept the State's argument would be to ignore the evidence of appellant's motive that is in the record — that appellant killed the victims because they had run him off and kept Mahoney and would not let him take Mahoney with him.

However, with respect to victim Richard Falls, the jury could take into account Stuckey's testimony that appellant had stated to him that Falls was "in the wrong place at the wrong time." In light of this evidence, the jury could have inferred that appellant killed Falls, a person he did not know, for no logical reason such as revenge or accident. *See Miller v. State, supra.* Thus, while we conclude that there was insufficient evidence to support the submission of the "avoiding arrest" aggravating circumstance to the jury on the counts relating to Wayne Helton, Cheryl Phegley, and Robert Phegley, we find no error in the submission of this aggravator on the count relating to victim Falls.

We can perform the statutory harmless error analysis in the penalty phase only if jury found no mitigating circumstances. *Greene v. State,* 317 Ark. 350, 878 S.W.2d 384 (1994); Ark. Code Ann. § 5-4-603(d) (Repl. 1993). Here, the jury unanimously found two mitigating circumstances on each count: (1) Appellant grew up in an environment of abuse and alcoholism; and (2) Appellant grew up in an environment where his father provided an example of extreme violent reactions to situations. Thus, we must reverse for resentencing the death sentences on the counts relating to Wayne Helton, Cheryl Phegley, and Robert Phegley.

*Victim-impact statute*

We discuss appellant's remaining penalty-phase arguments should they arise upon remand. Appellant challenges Arkansas's victim-impact statute, codified at Ark. Code Ann. § 5-4-602(4) (Repl. 1993), as being void for vagueness. Particularly, appellant claims that this statute fails to define who is a "victim." This statute provides in pertinent part as follows:

> In determining sentence, evidence may be presented as to any matters relating to aggravating circumstances enumerated in § 5-4-604, any mitigating circumstances, or any other matter relevant to punishment, including, but not limited to, victim impact evidence, provided that the defendant and the state are accorded an opportunity to rebut such evidence. (Emphasis added.)

Recently, we rejected a similar vagueness challenge to this provision in *Nooner* v. *State, supra,* stating as follows:

> The United States Supreme Court permits the States to authorize victim impact testimony. *Payne* v. *Tennessee,* 501 U.S. 808 (1991). The Court referred specifically to who might qualify as being impacted by a victim's death and to the State's legitimate interest in counteracting the defendant's mitigating evidence and in reminding the jury that the victim was a person "whose death represents a unique loss to society and in particular to his family." 501 U.S. at 825. Thus, the testimony may range from the victim's family to those close to that person who were profoundly impacted by his death. In the case before us, only [the victim's mother] gave impact testimony. We decline to hold Act 1089 of 1993 to be impermissibly vague.

That our victim-impact statute is not void for vagueness only resolves part of appellant's argument. He further contends that, because there is no place in the Arkansas statutory weighing process for the jury to consider victim-impact evidence, our victim-impact statute is violative of the Eighth and Fourteenth Amendments to the United States Constitution and Ark. Const. art. 2, § 9. Particularly, appellant contends that the victim-impact statute conflicts with Ark. Code Ann. § 5-4-603 and -604 (Repl. 1993), which direct the jury to determine whether aggravating circumstances exist, to weigh any aggravating circumstances against any mitigating circumstances, and to determine whether the aggravating circumstances justify a death sentence beyond a reasonable doubt. Again, we find appellant's argument unpersuasive.

In our decision in *Nooner,* we alluded to "the State's legitimate interest in counteracting the defendant's mitigating evidence." *Id.* at 109, *citing Payne,* 501 U.S. at 825. As the United States Supreme Court recognized in *Payne,* "there is nothing unfair about

allowing the jury to bear in mind [the specific harm caused by the defendant] at the same time it considers the mitigating evidence introduced by the defendant." 501 U.S. at 826. The Court recognized that a misreading of *Booth* v. *Maryland*, 482 U.S. 496 (1987), had "unfairly weighted the scales in a capital trial," as there are "virtually no limits placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." 501 U.S. at 822, *citing Mills* v. *Maryland*, 486 U.S. 367, 397 (1988)(Rehnquist, C.J., dissenting). As such, the Court held that "a State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827.

 Regarding appellant's Eighth Amendment claim, the United States Supreme Court has held that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa* v. *California*, ___ U.S. ___ (1994)(slip op. at 12). In so holding, the Court recognized that a contrary rule

> would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than mitigating factors. The States are not required to conduct the capital sentencing process in that fashion.

*Id.* at 13, *citing Gregg* v. *Georgia*, 482 U.S. 153, 199-200, n.50. Appellant also asserts that the victim-impact statute violates Art. 2, § 9, of the Arkansas Constitution, yet he has failed to present us with any argument showing us why we should interpret this provision in manner contrary to that of the Eighth Amendment to the United States Constitution. *See, e.g., Diffee* v. *State*, 319 Ark. 669, 894 S.W.2d 564 (1995); *Ridenhour* v. *State*, 305 Ark. 90, 805 S.W.2d 639 (1991).

 While the Eighth Amendment erects no per se bar to the introduction of victim-impact testimony, this rule is not without limits. When evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. *Payne*, 501 U.S. at 825; *Darden* v. *Wainwright*, 477 U.S. 168,

179-183 (1986). After reviewing the victim-impact evidence presented in this case, we conclude that this line was not crossed here.

Initially, we note that there was no victim-impact testimony offered at trial pertaining to victim Helton. Roberta Sullivan and Jerri Fletcher, sisters of Robert Phegley, both testified as to the loss they felt after their brother's death. Particularly, Roberta described her brother as "her best friend." She further described Cheryl as more like a daughter than a niece, as Cheryl had lived with her from age three to age fourteen. Jerri testified that she was angry over her brother's death and that he and Cheryl were a "duo" in the family. Since Jerri lived in Mississippi, she described her loss as "not a day-to-day thing [like] what the other sisters feel." Rhonda Darby, Robert's daughter and Cheryl's sister, testified that while she has never been really close to Cheryl, she was just starting to get close with her father again prior to his death. A high-school senior at the time of the incident, Rhonda stated her grades fell and she quit basketball. As she was to be married in three weeks, she would be denied the privilege of having her father escort her down the aisle.

Kelly and Kerri Falls, sisters of Richard Falls, testified that they were very close to their brother. As Kelly was the first person in her family notified of her brother's death, she experienced difficulty in having to inform her other family members. According to Kelly, her family experienced disbelief and anger and was "torn apart." Kerri used to see her brother every day, and her three-year-old son did not understand his uncle's death. We cannot say that this testimony was so unduly prejudicial that it rendered appellant's trial fundamentally unfair; thus, we reject his argument.

### Jury's ability to show mercy

Appellant contends that the trial court erred in refusing to give to the jury his proffered penalty-phase instruction, which reads as follows:

> Whatever the jury finds regarding aggravating and mitigating circumstances, they jury may still return a verdict of life imprisonment without parole.

We have held that AMCI 2d Form Three, Section (C) permits the jury to show mercy, as it allows the jury to find that the aggravating

circumstances do not justify a sentence of death. *Dansby* v. *State*, *supra*. Non-model instructions are to given only when the trial court finds that the model instructions do not accurately state the law or do not contain a necessary instruction on the subject. *Hill* v. *State*, 318 Ark. 408, 887 S.W.2d 275 (1994); *Misskelley* v. *State*, *supra*. Thus, we conclude that it was not error to refuse the appellant's proffered instruction.

### *Proffered verdict form*

 Kemp asserts that the trial court erred in refusing his proffered instruction, a modification of AMCI 2d Form 3, which states as follows:

> You are instructed that in consideration of mitigating circumstances each juror is to make his or her own weighing of aggravating circumstances with the mitigating circumstances that he or she has personally found, and is not restricted to those unanimously found by the jury.

The trial court denied appellant's proffer, and instructed the jury with AMCI 2d Form 3, which includes the following:

> (b) (_____) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by any juror to exist.

Relying on *Mills* v. *Maryland*, *supra*, appellant asserts that Form Three is violative of the Eighth Amendment because it is phrased in such a way so as to inform each juror that he or she could not consider evidence of a mitigating circumstance unless all other jurors unanimously agreed that the evidence supported the finding of the mitigating circumstance. We recently rejected this argument in *Bowen* v. *State*, *supra*:

> This same argument was made in *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990), on the basis of a Maryland case. We decided the argument lacked merit. We wrote:
>
> Our Form 2, which accompanies AMCI 1509, expressly allows the jury to list mitigating circumstances which were found by some, though not all, of its members. Form 3 then allows the jury to determine if the aggravating circumstances outweigh any mitigating circumstances. Nothing in the forms indicates to the jury that a mitigating

circumstance must be found unanimously before it may be considered in the weighing process. The potential for misunderstanding is not present in the Arkansas forms as it is in the Maryland forms.

322 Ark. 483 at 511.

In his reply brief, appellant maintains that this court's decision in *Willett* v. *State*, 322 Ark. 613, 911 S.W.2d 937 (1995), further demonstrates that his proposed instruction should have been granted. However, in *Willett*, the jurors completed AMCI 2d Form 2 in a contradictory manner, finding unanimously that three circumstances were mitigators in one section of the form, while indicating in another section that they had unanimously agreed that the same three circumstances were *not* mitigating circumstances. No such contradiction exists in this case.

### Other penalty-phase objections

 Appellant briefly submits three other points of error which he alleges occurred during the penalty phase. He asserts that the trial court erred (1) in refusing his proffered modified version of AMCI 2d Form Three, which would inform the jury that they "may" but were not required to give death even if all the interrogatories were answered in the affirmative; and (2) in refusing to modify Form Three to read, "[t]he aggravating circumstances, when weighed against the mitigating circumstances, justify beyond a reasonable doubt a sentence of death." He concedes that these two assignments of error are likely foreclosed by the United States Supreme Court's decision in *Blystone* v. *Pennsylvania*, 494 U.S. 299 (1990). We agree that they are.

 Appellant further contends that the trial court erred in refusing to strike the "risk of death to others" aggravating circumstance, and asks us to overrule our decision in *Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993), in which we held that the killing of more than one person "automatically" converts a case into a death case because the "risk of death to others" aggravating circumstance also covers actual deaths. We decline the invitation to overrule our precedent.

The record has been examined in accordance with Arkansas Supreme Court Rule 4-3(h), and it has been determined that there were no errors with respect to rulings on objections or motions

prejudicial to the appellant not discussed above.

Affirmed in part; reversed and remanded in part.

GLAZE, CORBIN, and BROWN, JJ., concur in part and dissent in part.

ROBERT L. BROWN, Justice, concurring in part; dissenting in part. I agree with the majority that the death sentence relating to the murder of Richard "Bubba" Falls must be affirmed, but I would affirm the other death sentences as well.[1]

The majority reverses because it discerns insufficient proof of aggravating circumstances in this case. The two aggravators found by the jury to outweigh mitigating factors are these:

> (1) The capital murder was committed for the purpose of avoiding or preventing an arrest.

> (2) In the commission of the capital murder, Timothy Wayne Kemp knowingly created a great risk of death to a person other than the victim.

Under our statutes, aggravating circumstances must exist beyond a reasonable doubt, and they must outweigh mitigating circumstances beyond a reasonable doubt. Ark. Code Ann. § 5-4-603 (Repl. 1993). We have held that the finding of an erroneous aggravating circumstance by the jury constitutes reversible error and grounds for resentencing. *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995).

I have concluded that the jury reasonably could have decided that Kemp killed all four victims to avoid arrest. The pivotal testimony at trial on why Kemp committed the murders came from his friend, Bill Stuckey:

> He [Kemp] gave as a reason for shooting these people that they had run him off and kept Becky and wouldn't let him take Becky with him. He was looking for Becky.

So, armed with a .22 Ruger semi-automatic rifle, Kemp returned to Wayne Helton's trailer to retrieve Becky Mahoney. It was obvi-

---

[1] There appears to be a discrepancy over the number of death sentences. The judgment and commitment order filed December 5, 1994, shows three capital murder convictions. The parties, however, agree that there were four murders, and the evidence and verdict forms substantiate that fact.

ous in light of the semi-automatic rifle that he planned to take her away by force, which is a crime. But he was confronted at the door of the trailer by Helton and the others. The shooting ensued, and all were killed except for Mahoney, who hid in a closet.

The majority engages in a metaphysical exercise when it speculates on which of the victims died first and for what reason. The evidence supports the jury's finding that Kemp returned to take Mahoney away at gunpoint and that he murdered everyone who was in his way. The truth of the matter is that all four people shot were Kemp's victims and all four were eliminated as potential witnesses. The number of gunshot wounds is instructive. Richard Falls, whose murder the entire court agrees warrants the death penalty, was shot only once, but Cheryl Phegley was shot five times, Robert Phegley was shot twice, and Wayne Helton received four gunshot wounds to the chest. Cheryl Phegley was chased down the hall and killed. Wayne Helton had two close-range wounds that support the State's theory that gunshots for the purpose of executing Helton were fired. An elimination of witnesses under these facts is a more than reasonable conclusion. Moreover, it is patently obvious that opening fire with a semi-automatic weapon caused a risk of death to others, thereby satisfying the second aggravating circumstance which the jury found.

In my judgment, the jury was well within the bounds of reasonable inference in concluding that the aggravators existed and that they outweighed evidence of mitigating factors.

There is a second reason why reversal and remand for resentencing involving three capital murder convictions is suspect. To remand for resentencing on concurrent offenses seems something of a bizarre exercise when one death sentence has been affirmed. *State v. Dawson*, 1995 WL 411372 (Del. Super. June 9, 1995). Parole eligibility will not be affected because the jury, on resentencing, can only consider death or life without parole. Even if the Governor eventually commuted an assessed death sentence, this would not enhance parole eligibility because persons serving commuted death sentences are not eligible for parole. Ark. Code Ann. § 5-4-607(c) (Repl. 1993). It could be argued that the possibility of commutation by the Governor might be increased if only one death sentence was involved as opposed to three or four. But that seems exceedingly speculative since the Governor would have the full array of the circumstances depicting Kemp's crime before him regardless of

whether one death sentence was at issue or more.

I respectfully dissent from that part of the majority opinion which requires reversal and a remand for resentencing.

GLAZE, J., joins.

TOM GLAZE, Justice, dissenting in part. In my view, the majority opinion's reasoning is seriously erroneous in finding, on the one hand, the state's evidence is *insufficient* to support the "avoiding arrest" aggravating circumstances given the jury for Kemp's murders of Wayne Helton, Cheryl Phegley, and Robert Phegley, but at the same time, finding the evidence *sufficient* to prove the "avoiding arrest" aggravating circumstance for the murder of Richard Falls. Kemp killed *all four* of these *victims at the same time and place.*

The majority opinion states the record shows that Kemp killed Wayne Helton and the Phegleys, who had earlier "run Kemp off" without letting him take his girlfriend, Mahoney. From the evidence, the jury could have found this to be *one* reason why Kemp killed these three victims, but the jury had every right to find another reason for Kemp's having killed all four victims — so no witnesses would be left to identify him. In this respect, Kemp stated that the other victim, Falls, was "in the wrong place at the wrong time," which statement, I suggest, meant Kemp had returned to murder everyone he found inside the trailer. The jury could have reasonably concluded from Mahoney's testimony that Kemp killed Falls first as Falls opened the trailer door; then, after killing Falls, a man he did not personally know, Kemp obviously had no intentions of leaving anyone found alive who could identify him.[1] Once Falls was murdered, Kemp's motive to rid the trailer of all witnesses became self-evident. Whether Kemp had additional reasons for killing some of the victims is irrelevant. By its reversal, this court robs the jury of its factfinding responsibility. Therefore, I respectfully dissent from the court's decision to reverse and remand the matter for resentencing.

CORBIN and BROWN, JJ., join this dissent.

---

[1] I note that another witness indicated that Kemp later said that Wayne Helton had opened the trailer door upon Kemp's return. Who opened the door and which victim was first shot was clearly a factual question for the jury to decide. In any event, Mahoney's testimony vividly supports the finding that Falls was shot first.