Kenneth D. WILLIAMS *v.* STATE of Arkansas

CR 01–364 67 S.W.3d 548

Supreme Court of Arkansas
Opinion delivered February 21, 2002
[Petition for rehearing denied March 21, 2002.]

*Montgomery, Adams & Wyatt*, by: *Dale E. Adams*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel* and *Jeffrey A. Webber*, Ass't Att'ys Gen., for appellee.

JIM HANNAH, Justice. Kenneth D. Williams was convicted of capital-felony murder and theft of property. He was sentenced to death on the capital-murder conviction and to forty years

on the theft conviction under habitual-offender enhancement. While the elements of capital-felony murder may be met by sufficient proof of any of the listed felonies in the statute, the jury found by separate unanimous verdicts that the State had proven both the underlying felony of first-degree escape and the underlying felony of aggravated robbery.

We take jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(2). On appeal, Williams raises twelve points for reversal. We determine additional points merit discussion, and that Williams correctly asserts that the issue of escape in the first degree as an underlying felony in capital murder was submitted to the jury in error. However, we hold the capital-murder conviction and sentence of death may be affirmed on the underlying felony of aggravated robbery, and that the remaining points lack merit. Williams's other convictions and sentence are affirmed.

*Facts*

This case involves an escape from the Cummins unit of the Arkansas Department of Correction and a number of crimes, including the murder of Cecil Boren near the prison and the death of Michael Greenwood in Missouri. On September 15, 1999, Williams arrived at the Cummins unit of the Arkansas Department of Correction. Earlier this same day he was sentenced to life without parole on convictions of capital murder, attempted capital murder, kidnapping, aggravated robbery, theft, and arson in Jefferson County. These convictions arose from events that occurred on December 13, 1998.

Earlier on August 26, 1999, Williams had been convicted of aggravated robbery, theft, kidnapping, and arson in Jefferson County. These convictions arose from events that occurred on December 5, 1998.

Williams's convictions and sentences arising from the December 5, 1998, crimes were affirmed by the court of appeals on November 29, 2000. His convictions and sentences arising from the crimes of December 13, 1998, were affirmed by this court on February 2, 2001.

On October 3, 1999, Cummins's Warden Warren Dale Reed received a call about 7:15 p.m. from his chief of security, Captain Donald Tate, telling him that Williams was missing. Major Wendell

Taylor, the unit's tracker, began a "drag around the compound" using dogs to try to pick up Williams's scent. This attempt was unsuccessful because too much time had passed since Williams's escape that morning. Emergency notifications were commenced.

The Department of Correction determined that Williams was released from his barracks that morning at 7:27 on a "religious call." It was determined that this allowed Williams to get into the area where the slop tanks for the kitchen are kept. These are devices that are used to hold, cook, and transport slop to hogs outside the prison. The slop tanks are 500-gallon tanks that are large enough for a man to fit into. The primary tank had a grating welded over the top opening. However, the alternate slop tank was in use due to a flat tire on the primary tank trailer. The secondary tank had no grate over the opening. The Department of Correction determined Williams got down inside this tank and was carried outside the prison confines when the tank was taken from the prison by the Department of Correction. Once outside the prison confines, Williams jumped from the tank in transit and hid in a ditch. He hid there for some time because local farmer Jimmy Dreher testified that that morning at about 9:42 he saw a man running across Highway 65 away from the prison. From the tracks the Department of Correction found, it appears Williams headed toward Highway 65, which took him in the direction of Cecil and Genie Boren's home. Williams's prison shirt showing his name and prison number was found a few months later hanging on a tree limb about a mile from the Boren home, substantiating his path.

Williams made it to the Boren home sometime in the morning. Earlier that morning, Genie Boren had gone to church leaving her husband Cecil Boren at home working in the yard. When she returned sometime after noon, she found he was no longer there. She called Kay McLemore, who lived about a mile from the Borens. Genie was frantic because her husband was not home, and their house had been ransacked. Kay drove over. They determined all the firearms were gone, except a muzzle loader. Kay went outside and began to look for Cecil and call for him. She found Cecil near a bayou not far from the house. He was lying face down without shoes or socks. He was dead. He had been shot seven times. Scrape marks on his body were later determined to show that his body had been dragged to that location, and that he had been shot closer to the home. A pool of blood was found closer to the home. The investigation at the Boren home revealed that Cecil Boren's wallet was missing, that other valuables from the home

were missing, that some clothing had been taken, and that a number of firearms as well as Cecil Boren's truck were missing.

Eddie Gatewood was a friend of Williams, and testified that on October 3, 1999, Williams showed up at his house asking for a map. He was driving the truck that was identified as Cecil Boren's. Gatewood testified that Williams told him he had done something to someone to get the truck. Gatewood further testified that prior to this date, he had visited Williams at prison, and Williams had told him he had to get out because he could not spend his life in prison. He also testified that Williams asked him during that visit to get him some clothes, a dress, and a wig, and leave them out on the highway close to the prison.

The next day, on October 4, 1999, Cecil Boren's truck was spotted in Lebanon, Missouri, by police officer Dennis Mathis. Officer Mathis attempted to pull over the truck being driven by Williams. Initially, Williams pulled over, but he then drove off. A high-speed chase commenced involving multiple police units covering approximately sixty miles. Speeds ranged as high as 120 miles per hour. Williams was only stopped when he struck a water truck that was turning left in front of him. Williams struck the truck in the cab. The driver, Michael Greenwood, was ejected and killed. Williams's truck was disabled by the collision. He then fled on foot before he was apprehended.

More than 114 personal items belonging to Cecil and Genie Boren were removed from Cecil's truck, including the firearms stolen from their home. At the time of his arrest, Williams was wearing Cecil's coveralls and two rings belonging to Cecil. He was also wearing clothing belonging to Genie Boren.

The State was unsuccessful in linking the firearms found to the .22 caliber fragments taken from Cecil's body. There was testimony that the fragments likely came from one of six manufacturers, including Ruger, and there was testimony that Cecil had a Ruger .22 caliber semi-automatic pistol that was not found. A clip to a Ruger .22 automatic was found in the truck when Williams was apprehended.

Dr. Frank Peretti, the State's medical examiner, testified that Cecil had suffered seven gunshot wounds. According to Dr. Peretti's testimony, all the wounds were inflicted from some distance, and the cause of death was the gunshot wounds.

■ Williams asserts that the trial court erred in denying his motion for a directed verdict on first-degree escape. A motion for a directed verdict is a challenge to the sufficiency of the evidence, and the test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001).

The jury found that the elements of first-degree escape were present. This was one of two felonies that the State relied upon in charging and prosecuting Williams for capital-felony murder under Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997). Williams now argues that the trial court was in error in failing to grant his directed-verdict motion on this issue because the State failed to prove the elements of first-degree escape in that the State failed to prove the threat of, or use of, a deadly weapon in Williams's escape from a correctional facility. As noted, Williams fled the penitentiary by climbing in a hog-slop tank and waiting to be hauled outside where he jumped from the tank. From there he went on foot to the Boren home where he robbed and killed Cecil Boren.

The facts show the murder of Cecil Boren occurred at least five miles from the prison and took place at least three hours after Williams departed the prison in the slop tank. According to the testimony of Warden Reed, prison records showed Williams was present at the 6:00 a.m. count. Again, according to Reed's testimony, Williams left his barracks at a 7:27 a.m. church call. Reed testified that this allowed Williams to get into a kitchen area and get into the slop tank. Reed further testified that the slop tank left the prison at 8:03 a.m., and that foot tracks were later located about 3/4 mile from the prison where the road turned. It was here, Reed concluded, that Williams jumped from the tank. Reed also testified that knee prints were found at the road ditch where Williams came to rest from his jump. Reed further testified that there were additional tracks showing Williams headed off in the direction of Highway 65 and that this was the first area where a person could hide during the day and effect an escape. According to Major Wendell Taylor, the ditch was about four feet deep with grass to either side providing the only cover in the area because the farmland all around had been plowed over after harvesting. Taylor further testified that they found footprints showing Williams had hidden there, and that he had then made his way along this and other ditches. Taylor then testified that a few months after the murder, he and others retraced

Williams's path on horseback. During the course of this, they found Williams's ADC shirt which had his name and ADC number printed on the front. It was found between the prison and the Boren home. Taylor further testified that they reenacted the escape with another man on foot following the path they believed Williams took. Moving as fast as he could, the man made it to the Boren home in an hour and twenty minutes. How long it took Williams to make this journey depended on how long he may have stopped and waited from time to time to be sure he was not seen or for some other purpose.

Kay McLemore testified that she went by to see the Borens that morning on her way home from church between 11:30 a.m. and noon. When she reached a point where she could see the carport and home, she saw that Mr. Boren's truck was gone. Seeing that the truck was gone, Kay went to her own home and then later received the call from Genie Boren telling her Cecil was missing.

Thus, based upon these facts, it appears Williams escaped from the prison at 8:03 a.m., that he hid in the grass and cover near the prison until at least 9:42 a.m., and that he then made his way to the Boren home five miles away. He was not reported missing until that night, so no one was out looking for him. Williams asserts these facts will not support the charge of first-degree escape.

 The elements of first-degree escape pertinent to the facts of this case are set out in Ark. Code Ann. § 5-54-110(a)(2) (Repl. 1997):

> (a) A person commits the offense of first-degree escape if:
>
> . . . .
>
> (2) He uses or threatens to use a deadly weapon in escaping from custody, from a correctional facility, from a juvenile detention facility, or from a youth services facility.
>
> (b) First-degree escape is a Class C felony.

The elements of second degree escape pertinent to the facts of this case provide that second-degree escape is committed where a felon escapes from the correctional facility. No use of force is required. Arkansas Code Annotated § 5-54-111 (Repl. 1997) provides in pertinent part:

(a) A person commits the offense of second degree escape if:

(1) He uses or threatens to use physical force in escaping from custody; or

(2) Having been found guilty of a felony, he escapes from custody; or

(3) He escapes from a correctional facility;

. . . .

(b) Second degree escape is a Class D felony.

Thus, first-degree escape requires the threat or use of deadly force in escaping, and second degree merely requires escaping. Where a person is committed to and present in a facility of the Department of Correction, the word "escape" is defined as the unauthorized departure of a person from a correctional facility. Ark. Code Ann. § 5-54-101(3) (Repl. 1997). *See also, Bush v. State*, 338 Ark. 772, 2 S.W.3d 761 (1999); *Wade v. State*, 290 Ark. 16, 716 S.W.2d 194 (1986). Although this statute has been cited, the phrase "unauthorized departure" has not been interpreted. First-degree escape requires the threat of or use of a deadly weapon in escaping custody. No such weapon was used in entering the slop tank and exiting the confines of the prison, but a deadly weapon was used in the robbery and murder of Mr. Boren. The question we must answer is whether the robbery and murder of Mr. Boren may be construed as part of "escaping from custody." As noted, escape is defined simply as an unauthorized departure. Ark. Code Ann. § 5-54-101(3).

■■ We strictly construe criminal statutes and resolve any doubts in favor of the defendant. *Sansevero v. State*, 345 Ark. 307, 45 S.W.3d 840 (2001); *Hagar v. State*, 341 Ark. 633, 19 S.W.3d 16 (2000). "There is no better settled rule in criminal jurisprudence than that criminal statutes must be strictly construed and pursued. The courts cannot, and should not, by construction or intendment, create offenses under statutes which are not in express terms created by the Legislature." *Holford v. State*, 173 Ark. 989, 1000, 294 S.W. 33 (1927). It is also axiomatic that in statutory-interpretation matters, we are first and foremost concerned with ascertaining the intent of the General Assembly. *Sanservo, supra*. In cases of statutory interpretation, we give words their ordinary and usually accepted meaning. *Hagar, supra; Bush, supra*.

■ Although this court has not interpreted the pertinent language of the present statute, the concept has been before this court. The crime of escape is committed when a prisoner under lawful arrest and restraint "goes away from his place of lawful custody before he is released or delivered by due course of law." *Williams v. State*, 259 Ark. 549, 550, 534 S.W.2d 760 (1976); *Cassady v. State*, 247 Ark. 690, 692, 447 S.W.2d 144 (1969). More particularly, with respect to a convict, the crime is committed when the convict leaves the "bounds" within which he is required to remain. *Jenks v. State*, 63 Ark. 312, 314, 39 S.W. 361 (1896).

■ Our current statute was adopted by Act 280 of 1975; however, the discussion in the earlier cases is helpful. The earlier use of "goes away" or leaving the "bounds" are both consistent with the word "departure" in Ark. Code Ann. § 5-54-101(3). Under this reasoning, Williams escaped custody when he departed the confines of the prison or, in other words, as the slop tank left the gate. At that point, he was criminally liable for the escape. At that point he was no longer within the bounds of his confinement and was no longer under the control of the Department of Correction. We also note that it was three hours later and five miles away that he acquired and used deadly force.

Similar to our statute, the Texas Penal Code defines escape as an "unauthorized departure." Tex. Penal Code Ann. § 38.01(2) (Vernon 2001). In *Lawhorn v. State*, 898 S.W.2d 886, 890 (Tex. Crim. App. 1995), the Court of Criminal Appeals of Texas stated:

> While the State urges that we view escape as a "continuing" offense, the language of the statute precludes such a construction. In the instant context the phrase "departure from custody" denotes the act of leaving a state of detention or restraint by a peace officer and once the act is done the escape is accomplished. The Legislature did not include as an element of the offense of escape the notions of flight thereafter and/or continued evasion of arrest.

Earlier, this same court stated even more specifically that when the criminal defendant moved beyond the bounds of the unit of the department of correction where he was confined, the offense was complete. *Fitzgerald v. State*, 782 S.W.2d 876 (Tex. Crim. App. 1990). Other courts have found likewise. In *People v. Guevara*, 88 Cal. App. 3d 86, 151 Cal. Rptr. 511 (1979), the California Court of Appeals stated that the escape at issue was complete when the criminal defendant departed the limits of the facility he was in with

the intention of escaping. *See also, People v. Johnson,* 62 Mich. App. 240, 233 N.W.2d 246 (1975).

■ We must conclude that Williams escaped custody when he left the confines of the prison in the slop tank. This means that the element of use or threat of use of a deadly weapon in escaping custody required by first-degree escape is missing. The trial court was in error in submitting the issue of first-degree escape to the jury as a felony underlying capital-felony murder.

### Death Penalty and Felony Murder

Williams next argues that if there was insufficient evidence of first-degree escape, his conviction for capital murder must be over-turned because this court cannot determine whether the felony capital-murder conviction was based upon the underlying felony of first-degree escape or the underlying felony of aggravated robbery. Williams is mistaken. The verdict forms show the jury found that Williams was guilty of capital murder as well as the underlying felony of aggravated robbery and the underlying felony of first-degree escape. Although we hold there was insufficient evidence of first-degree escape to submit that felony as an element of felony capital murder to the jury, that in no way affects the jury's finding of guilt of the underlying felony of aggravated robbery.

■ Proof of the felonies was offered to satisfy the elements of capital-felony murder. Under capital-felony murder, the State must first prove the felony, so the felony becomes an element of the murder charge. *Ross v. State,* 346 Ark. 225, 57 S.W.3d 152 (2001). Proof of each felony was presented separately, and each felony may be examined separately.

The jury was instructed that Williams was charged with capital murder, which included the lesser crime of murder in the first degree. The jury was further instructed that they could find him guilty of capital murder, of first-degree murder, or they could acquit him. The jury was then instructed that the charge of capital murder was dependent upon a finding that Williams committed the crime of first-degree escape or that he committed the crime of aggravated robbery, and that in the course and furtherance of the commission or in immediate flights there from each felony he caused the death of a person under circumstances manifesting extreme indifference to the value of human life. The jury was also instructed that the verdicts must be unanimous.

██ ██ The jury returned a verdict finding Williams guilty of capital murder. In this case, there were separate verdict forms on both underlying felonies showing the jury found the elements of each were met. The jury found the State met its burden of proof on first-degree escape and on aggravated robbery. Although we now find the felony of first-degree escape was submitted to the jury in error, the statute requires but one, and the felony of aggravated robbery found by the jury is sufficient. The crime of aggravated robbery in this case was an element of capital murder. *McClendon v. State*, 295 Ark. 303, 748 S.W.2d 641 (1988). The jury was instructed that for the State to sustain the charge of capital murder, the State had to prove beyond a reasonable doubt that Williams "committed the crime or crimes of aggravated robbery or escape in the first degree." Thus, the jury was instructed that if either felony was proven, the charge of capital murder was sustained. The jury returned verdicts finding both crimes were proven beyond a reasonable doubt. As discussed above, the crime of first-degree escape must be disregarded; however, that in no way affects the verdict on aggravated robbery. The jury was instructed that capital murder was sustained if either felony was proven. Here, the verdict form provides the juries findings. The verdict states, "We the jury find Kenneth Williams guilty of capital murder." It also plainly states, "We the jury find Williams guilty of aggravated robbery." There is no issue of whether aggravated robbery was the basis of the jury's verdict. They were so instructed and so found. That the findings on first-degree escape must be ignored is of no impact. Capital-felony murder only requires one felony. Ark. Code Ann. 5-10-101; *Richie v. State*, 298 Ark. 358, 767 S.W.2d 522 (1989).

*Prison Garb*

██ ██ Williams also asserts that he was denied the presumption of innocence when the trial court required him to wear prison garb while being tried in this case. At issue is whether Williams received a fair trial. The presumption of innocence is a fundamental right in the American system "antedating any constitution and an essential element of due process of law." *Williams v. State*, 259 Ark. 667, 672, 535 S.W.2d 842 (1976). This presumption puts in issue the truth and credibility of all of the evidence offered against an accused. *Williams, supra.* In *Clemmons v. State*, 303 Ark. 265, 268, 795 S.W.2d 927 (1990) (citing *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)), this court stated that central to the issue of a fair trial is the principle that "one accused of a crime is entitled to have his guilt or

innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." In this context, the accused is entitled to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man. *Miller v. State*, 249 Ark. 3, 457 S.W.2d 848 (1970) (citing 21 AM. JUR. 2d *Criminal Law* § 239).

 Further, in *Miller, supra*, this court set out the rule in this State that absent a waiver, the accused may not be forced to go to trial in prison garb. Later, in 1976, the United States Supreme Court cited this court's opinion in *Miller*, as well as a number of other state supreme court decisions, in its discussion of the issue of prison garb in the federal context. The Court concluded that under the Fourteenth Amendment to the United States Constitution, a State may not compel an accused to stand trial before a jury dressed in prison garb, although the Court went on to hold that under the federal requirements a failure to object negates any compulsion necessary to establish a violation under the United States Constitution. *See Estelle v. Williams*, 425 U.S. 501 (1976).

 However, in this case Williams committed the acts during the course of an escape from the custody of the Arkansas Department of Correction. The acts included escape, capital murder, aggravated robbery, and theft. The United States Supreme Court in *Estelle* noted that courts have refused to find error in requiring the defendant to wear prison garb in such situations. It is obvious that during the course of the trial, Williams's incarceration would be revealed to the jury. It is equally obvious that during trial the jury would be told these crimes were committed after he escaped and while he was trying to avoid apprehension. One crucial piece of evidence admitted in this trial was his white ADC shirt showing Williams's name and identification number found a mile from the Boren home.

We have recognized in the context of restraints that when the defendant is an inmate at the state prison at the time of the trial, and these facts will be revealed during the course of the trial, any prejudice that may have resulted from having the defendant in restraints would be rendered harmless because the restraints add nothing to the trial that was not already apparent from the nature of the case. *Tucker v. State*, 336 Ark. 244, 983 S.W.2d 956 (1999). *See also, Glick v. State*, 286 Ark. 133, 689 S.W.2d 559 (1985). As the United States Supreme Court noted in this regard, no prejudice can result from seeing that which is already known. *Estelle.* As one who

was prosecuted for crimes committed in the course of his escape and flight from prison, that Williams wore prison garb was something that was known, or by necessity would become known during trial and could pose no prejudice. The trial court did not commit error in requiring Williams to wear his prison garb during the trial and the related proceedings.

*Restraints*

Williams also argues he was denied a fair trial because he was deprived of the presumption of innocence in that he was shackled during trial. The photographs offered show Williams in handcuffs and, in addition, show his hands and feet were shackled. Although the jury's view of Williams was obscured somewhat, they may have seen his restraints when he got a drink of water and when he wrote notes to his attorneys.

In *Johnson v. State*, 261 Ark. 183, 546 S.W.2d 719 (1977), this court stated that being brought in to a courtroom in handcuffs is not *per se* prejudicial, and that there was no prejudice or abuse of discretion shown in *Johnson* where the appellant was on trial for escape from the Department of Correction. A trial court may take such steps as are reasonably necessary to maintain order in the courtroom, especially where the criminal defendant has engaged in disruptive behavior, attempted escape, or is charged with violent felonies. *Townsend v. State*, 308 Ark. 266, 824 S.W.2d 821 (1992). *See Stanley v. State*, 324 Ark. 310, 920 S.W.2d 835 (1996).

Restraints are not *per se* prejudicial, and the defendant must affirmatively demonstrate prejudice. We will not presume prejudice when there is nothing in the record to indicate what impression may have been made on the jurors or where the appellant did not offer any proof of prejudice. *Tucker, supra; Hill v. State*, 285 Ark. 77, 685 S.W.2d 495, 496 (1992).

Williams has a long criminal past, including a conviction for capital murder, and two convictions for kidnapping and arson. He was on trial for capital murder, aggravated robbery, theft, and escape. Additionally, evidence was offered to show that at the prior trial for capital murder, Williams had taunted the victims and victims' relatives and had ended up in an altercation with one. This required officers to carry Williams from the courtroom. It would be difficult to imagine a criminal defendant that would better fit the

definition of a high-risk defendant. Williams offers no proof of prejudice beyond the general assertion that he could not be tried in restraints, with the exception of one prospective juror during voir dire who was excused for cause. The remainder of the jurors stated that they understood the necessity for the security and that it would not influence their decision as to whether Williams was guilty of these felony charges. The trial court did not abuse its discretion, and Williams's right to a fair trial was not violated. The restraint was reasonably necessary to maintain order in the courtroom. *Terry v. State*, 303 Ark. 270, 796 S.W.2d 332 (1990).

### Presence of Guards

 Williams next argues he was prejudiced by the presence of multiple officers in the courtroom in that this conveyed to the jury that he was already guilty. The photographs show that three officers were present behind Williams and were seated in the first row in the gallery. At times there were two officers present. Williams was already convicted of capital murder and other serious crimes of violence. He was again on trial for capital murder and on trial for escape. In the prior trial he had engaged in disruptive behavior, had taunted the victim's family, and had ended up in an altercation that required officers to subdue him. Williams presented a serious threat to those present and to the proceedings. He was a high-risk criminal defendant. As discussed above, Williams's situation was known to the jury or was made known to them during the trial. The presence of the guards under these circumstances does not demonstrate that their presence was prejudicial to Williams. *Glick, supra*. The trial judge is in a better position to judge the dangers posed by a criminal defendant than this court is on appeal. *Tucker, supra*. We also note that Williams's own conduct brought about the need for multiple officers. It required three officers at his prior trial to subdue him. Williams shows no prejudice, and maintaining order and control is a matter within the discretion of the trial court. *Terry, supra; Rayburn v. State*, 200 Ark. 914, 141 S.W.2d 532 (1940).

### Impartial Jurors

Williams also argues he was denied a fair trial because the trial court seated juror Washington and juror Patrick. He alleges that juror Washington was so biased in favor of the death penalty that she would not weigh the evidence and follow the instructions. He

alleges juror Patrick was likewise biased because her nephew had been murdered, and the murder was prosecuted.

 As to juror Washington, Williams admits he did not move to excuse her for cause. To challenge a juror on appeal, appellant must show he exhausted his peremptory challenges and was forced to accept a juror who should have been excused for cause. *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001). Thus, this issue was not preserved for review on appeal and will not be considered.

██ As to juror Patrick, the decision to excuse a juror for cause rests within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of discretion. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 737 (1999); *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995), cert. denied, 517 U.S. 1143 (1996). Persons comprising the venire are presumed to be unbiased and qualified to serve. *Smith v. State*, 343 Ark. 552, 39 S.W.3d 739 (2001). The burden is on the party challenging a juror to prove actual bias, and when a juror states that he or she can lay aside preconceived opinions and give the accused the benefit of all doubts to which he is entitled by law, a trial court may find the juror acceptable. *Bangs, supra.* However, we have also recognized that the bare statement of a prospective juror that he can give the accused a fair and impartial trial is subject to question. *Taylor v. State*, 334 Ark. 339, 974 S.W.2d 454 (1998). Nonetheless, any uncertainties that might arise from the response of a potential juror can be cured by rehabilitative questions. *Taylor, supra; Cox v. State*, 313 Ark. 184, 853 S.W.2d 266 (1993). Finally, even if the trial court abuses its discretion, appellant must show prejudice, a prerequisite to a reversible-error claim. *See Williams v. State*, 327 Ark. 97, 938 S.W.2d 547 (1997).

█ Juror Patrick stated in *voir dire* that she believed in the death penalty in certain cases. Patrick also stated that her nephew had been murdered and that someone was convicted for his murder. She denied that the murder and conviction would influence her decision in this case. She denied the murder of her nephew caused her to feel sympathy for the Boren family. She also stated she could weigh both the death penalty and life without parole, and that she would have to listen to the evidence to decide. She also stated she could consider mitigating circumstances and weigh them against aggravating circumstances. Also, juror Patrick further stated that she could lay aside any preconceived opinions and give the accused the benefit of all doubts to which he was entitled by law. Williams

moved to excuse Patrick for cause and asserts he would have used a peremptory challenge had he had one remaining. Williams fails to show actual bias or prejudice. Once the issue of her nephew's murder was raised, the questions posed and the responses given cured any issue of bias. The trial court correctly found juror Patrick acceptable. *Bangs, supra; Cooper, supra.*

## The High-Speed Chase in Missouri

Williams next asserts the trial court erred in admitting evidence of the events in Missouri in the guilt and penalty phases of trial. Williams more specifically argues that the evidence of events in Missouri should have been excluded as more prejudicial than probative under Ark. R. Evid. 403. The trial court limited admission of the evidence of Mr. Greenwood's death to the penalty phase.

We first note that evidence crucial to show Williams murdered Cecil Boren was obtained as a consequence of this chase. First, Cecil's truck was discovered in Williams's possession. Second, firearms and other personal effects belonging to Cecil were discovered in the truck and tended to show Williams had robbed Cecil. Cecil's rings were on Williams's hand. Third, a .22 Ruger magazine was found in Williams's possession in Missouri. The testimony regarding this evidence necessarily required mention of the events in Missouri. Williams argues that it did not require, however, evidence of the death of Mr. Greenwood, and that this acted to his prejudice.

Williams argues that even if the evidence was relevant it was so prejudicial that under Ark. R. Evid. 403, the trial court abused its discretion when it refused to exclude it on that basis. The standard of review on admission of evidence is abuse of discretion. *Branstetter, supra.* The evidence of the chase quite clearly showed how desperate Williams was to avoid arrest. The evidence was that he attained speeds of 120 miles per hour. Further, the evidence shared that he plowed into the water truck, and then, rather than being concerned about the man he had injured or killed, he fled on foot. Evidence of flight to avoid arrest may be considered by the jury as corroborative of guilt. *Flowers v. State,* 342 Ark. 45, 25 S.W.3d 422 (2000); *Cooper v. State,* 317 Ark. 485, 879 S.W.2d 405 (1994). Further, evidence of the events in Missouri were part of the same criminal episode that began at Cummins and ended with Williams's final attempts to avoid apprehension in Missouri. *Wilson v. State,* 298 Ark. 608, 770 S.W.2d 123 (1989). These events occurred on the morning after Williams had murdered Cecil Boren

and then fled in his victim's truck with every weapon and thing of value he could take from the victim's home. We find no error in admission of the complained-of evidence. Because we find it was relevant and admissible in the guilt phase, and would have thus been known by the jury, there can be no claim of prejudice as to the penalty phase.

### Mitigation Evidence

Williams also argues that the record shows the jury impermissibly ignored mitigation evidence it was bound to consider. More specifically, he alleges that he put on unrefuted expert evidence that he suffered from mental and familial dysfunction and that his mind was defective and did not function as it should. Williams argues that because this was unrefuted expert evidence beyond the understanding of lay persons, the jury erred when it concluded this testimony was insufficient to establish a mitigating factor.

██ ██ There is no merit to this claim. In *Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (1992), this court stated:

> It has consistently been held . . . that a jury is not bound to accept opinion testimony of experts as conclusive, and it is not compelled to believe their testimony any more than the testimony of other witnesses. Even when several competent experts concur in their opinions, and no opposing expert evidence is offered, the jury is bound to decide the issue upon its own judgment. Testimony by expert witnesses is to be considered by the jury in the same manner as other testimony and in light of other testimony and circumstances in the case. The jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it they it believes to be true. *Robertson v. State*, 304 Ark. 332, 802 S.W.2d 448 (1991); *Gruzen v. State*, 267 Ark. 380, 591 S.W.2d 342 (1979).

*See also, Haynes, supra.* We also note, as the State argues, that the expert testimony was subjected to cross-examination that challenged the conclusions. Further, there was other testimony of familial conditions and Williams's past, education, and challenges in growing up. Thus, the expert testimony offered under examination by defense counsel was not the only evidence. It is the jury's decision as to what weight to give evidence. *Davasher, supra.*

*Lack of a Correction Expert*

■ Williams next argues that the trial court abused its discretion in denying his motion for funds to retain a corrections expert who would have testified that the Department of Correction was negligent in handling Williams, and that the violent acts committed upon his escape were predictable given his past history. To be admissible, evidence of mitigating circumstances must be relevant to the issue of the defendant's punishment. *Simpson v. State*, 339 Ark. 467, 6 S.W.3d 104 (1999); *McGehee v. State,* 338 Ark. 152, 992 S.W.2d 110 (1999).

■ Where the offered evidence of mitigation has nothing to do with a criminal defendant's character, record, background, history, condition, or the circumstances of his crime, it is not relevant on the issue of punishment. Williams's argument is essentially that because the Department of Correction knew he was a violent man, it should have protected him against himself by assuring he did not escape and that somehow the alleged negligence of the Department of Correction diminished Williams's responsibility for the carnage he wreaked upon his escape.

■ ■ Even the slightest evidence of a mitigating circumstance may be submitted to the jury. *Willett v. State*, 335 Ark. 427, 983 S.W.2d 409 (1998). The proposed evidence, however, casts no light on Williams's culpability. It does not have any tendency to diminish Williams's responsibility. It is not a mitigating circumstance. It was inadmissible.

*Victim-Impact Evidence*

■ Williams asks this court to overturn its prior decisions finding victim-impact evidence constitutional. He asserts that victim-impact testimony causes the jury to punish based upon sympathy for the victim and his or her family rather than based upon what the criminal defendant did. This argument has been considered and rejected by this court. *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000). *See also, Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998); *Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996).

■ Williams also argues error in the following victim-impact testimony:

Q. Ms. Knight, you, obviously, are aware of why we're here and the purpose. This is your opportunity to explain to the members of the jury the effects and the impact that the death of your brother had on you and if you would, take this opportunity to do so.

A. . . . The meeting of my brother and sisters when we get together it'll never be the same. We ask ourselves what we can do in situations like this. Well, we can't do anything as a family but hold together and pray together. But you can do something. You are in a position to do that. What would you do if it was your brother or your sister or your baby that someone stole away from you. I can't do anything, but you can. . . .

Williams did not object until after Knight finished testifying. Williams asserts he had a continuing objection to this type of testimony; however, the record reveals no such objection. This court will not consider arguments on appeal in the absence of a specific, contemporaneous objection at trial. *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001).

### Multiple Deaths

Williams next argues there is a lack of evidence of multiple deaths, and that it was error to submit this aggravator. Williams argues that escape may not constitute a continuing offense allowing inclusion of the death of Greenwood in Missouri as a death in the multiple-death aggravating circumstance.

What is before us is a number of crimes committed in the course of a single criminal episode. Williams made it clear to Gatewood in a visit to the prison that he would not, and could not, spend his life in prison. Williams made plain his intent to escape and sought Gatewood's assistance in providing him clothing, which Gatewood refused to do. Then, Williams did escape. Williams went to Cecil Boren's house where he robbed and murdered Boren and obtained money, firearms, and a truck. Williams then went to Gatewood to try to get help. Gatewood did not help him, but in the course of the discussion, Williams told Gatewood he had to do something to someone to get the truck he had. He then fled to Missouri where the very next morning he was spotted and his flight continued and resulted in Greenwood's death. All of these acts grew out of the same criminal episode which commenced with the escape and murder in Lincoln County and ended with the crash and

apprehension in Missouri. *Wilson v. State, supra.* Both deaths were properly put before the jury. There was no error in submitting the aggravator on multiple deaths.

## Murder to Avoid Arrest

 Williams then asserts there was no evidence of murder to avoid arrest and that, therefore, submission of this as an aggravating circumstance to the jury was error. Williams mischaracterizes the aggravating circumstance. The aggravator presented to the jury was that "[t]he capital murder was committed for the purpose of avoiding an arrest or affecting [sic] an escape from custody." As discussed above, the evidence presented tended to show Cecil Boren was murdered because he had things Williams wanted, including Boren's truck, and these things were needed by Williams to effectuate his escape from the area of the prison. There is no merit to the claim there was no evidence underlying submission of this aggravating circumstance.

 We review the sufficiency of the State's evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Kemp v. State,* 324 Ark. 178, 919 S.W.2d 943 (1996). The rule continues to be that the jury may consider those mitigating and statutory aggravating circumstance for which evidence, however slight, exists. *Willett, supra.* However, as also there stated, we will continue to review all findings relating to aggravating circumstances that support the imposition of a death penalty to determine whether there existed substantial evidence for the jury to find beyond a reasonable doubt that one or more aggravating circumstances existed, that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and that the aggravating circumstances justified a sentence of death beyond a reasonable doubt. *Willett, supra.* In this case there was substantial evidence showing the capital murder was committed for the purpose of avoiding an arrest.

## Arkansas Code Annotated
## § 5-4-604(2) and (5)

 Williams next asserts that Ark. Code Ann. § 5-4-604(2) and (5) (Supp. 2001) are duplicative and, therefore, the case must be

reversed. Section 5-4-604, aggravating circumstances, provides in pertinent part:

> (2) The capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

> . . . .

> (5) The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

These two aggravating circumstances are not duplicative. Paragraph (2) is more general and does arguably cover Mr. Boren's murder as it was committed while Williams was unlawfully at liberty. Paragraph (5), however, is much more narrow, covering murders committed while trying to avoid arrest or committed in the course of escape from custody.

### Alternate Juror

 Finally, Williams argues he suffered reversible error when the trial court replaced juror Lori Heiles with an alternate juror for the penalty phase. Juror Hieles was excused when her sister became gravely ill. Williams argues that, under Ark. R. Crim. P. 32.3(c)(1), the trial court erred when it failed to offer Williams the opportunity to be sentenced by the trial court. Arkansas Rule of Criminal Procedure 32.3 provides in pertinent part:

> (c) In the case of a capital murder trial or any other bifurcated trial in which the court cannot fix punishment pursuant to Ark. Code Ann. § 5-4-103(b), and in which there are alternate jurors remaining after the jury has returned a verdict of guilty, the next alternate jurors, not to exceed two, shall be placed in the jury box along with the regular jurors. Any alternate jurors in addition to these two shall be dismissed. The trial will proceed with the penalty phase. When the jury retires to deliberate the penalty, the remaining alternate juror or jurors will again remain at the courthouse during deliberation.

> (1) If at any time after a verdict of guilty, but before a verdict fixing punishment, a juror who participated in the guilt phase of a capital murder trial or other trial described above dies, becomes ill,

or is otherwise found to be unable or disqualified to perform his or her duties, such juror shall be discharged. The court may in its discretion, as an alternative to mistrial or any other option available by statute or these rules, replace such juror with the next alternate. However, in such event, the court may first give the defendant, with the agreement of the prosecution, the option to waive jury sentencing, in which case the court shall impose sentence, or to accept a verdict by the remaining jurors. If the defendant does not waive jury sentencing, or agree to accept a verdict by the remaining jurors, the trial will continue with the alternate participating in the penalty phase. In such event, the court shall instruct the jury to commence deliberation anew as to the sentencing phase only.

(2) Notwithstanding Ark. Code Ann. § 5-4-602(3), which requires that the same jury sit in the sentencing phase of a capital murder trial, the court may in its discretion proceed pursuant to this rule and seat an alternate juror.

This is an issue of first impression and requires us to interpret our rules of criminal procedure. We construe court rules using the same means, including canons of construction, that are used to interpret statutes. *Smith v. Smith*, 341 Ark. 590, 19 S.W.3d 590 (2000). The above language provides that the trial court may in its discretion, as an alternative to mistrial or any other option available by statute or these rules, replace a juror with the next alternate. The rule then goes on to state that in such event, the court may first give the defendant, with the agreement of the prosecution, the option to waive jury sentencing, in which case the court shall impose sentence or to accept a verdict by the remaining jurors. Williams asserts that the trial court was required to consult him and give him the above-mentioned choice. However, the word "may" is usually employed as implying permissive or discretionary, rather than mandatory, action or conduct and is construed in a permissive sense unless necessary to give effect to an intent to which it is used. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001). The rule that provides the trial court may substitute as it did in this case. The rule further allows the court in its discretion to involve the parties as discussed in the rule; however, there is no obligation for the court to do so. Thus, there was no error when the trial court substituted the alternate juror without discussing it with the parties.

*Arkansas Supreme Court Rule 4-3(h)*

The transcript of the record in this case has been reviewed in accordance with our Rule 4-3(h) which requires, in cases in which there is a sentence to life imprisonment or death, that we review all prejudicial errors in accordance with Ark. Code Ann. § 16-91-113(a). None has been found.

Affirmed.

IMBER, J., concurring.

ANNABELLE CLINTON IMBER, Justice, concurring. I agree with the majority, but write separately only to point out the trial court instructed the jury in a manner that would permit it to return a guilty verdict against Williams on the capital murder count if it found him to have committed *either* one or both of the underlying felonies, first-degree escape or aggravated robbery. The jury returned a general verdict of guilty on the capital felony murder charge. The majority opinion concludes that a directed verdict should have been granted on the first-degree escape charge because the State produced insufficient evidence to prove that Williams committed first-degree escape. Specifically, there was no proof of the element of "use or threat [to] use . . . a deadly weapon in escaping custody" as required under our criminal statutes for first-degree escape. Ark. Code Ann. § 5-54-110(a)(2)(Repl. 1997).

Williams cites no case in which a general verdict has been set aside not because one of the possible bases of conviction was unconstitutional, as in *Stromberg v. California*, 283 U.S. 359 (1931), but merely because it was unsupported by sufficient evidence. In *Griffin v. United States*, 502 U.S. 46 (1991), the United States Supreme Court declined to set aside a general verdict on a multiple-object conspiracy where the evidence was inadequate to support conviction as to one of the objects. In so holding, the Supreme Court quoted with approval the following language from *United States v. Townsend*, 924 F.2d 385, 474 (7th Cir. 1991):

> It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance — remote, it seems to us — that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

Accordingly, the conviction of capital murder in this case should be affirmed without regard to the State's proof on the charge of first-degree escape because there was sufficient evidence to convict Williams of capital murder committed in connection with the underlying felony of aggravated robbery.