2012 Ark. App. 315

**Jackie GREEN, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–1111.**

Court of Appeals of Arkansas.

May 2, 2012.

Robert M. "Robby" Golden, Little Rock, for Appellant.

Brad Newman, Assistant Attorney General, for Appellee.

DOUG MARTIN, Judge.

The Lonoke County Circuit Court found Jackie Green guilty of first-degree criminal mischief, first-degree terroristic threatening, aggravated assault upon an employee of a correctional facility, and third-degree assault. Green was sentenced to 120 days in jail, with sixty-eight days' credit for time served and fifty-two days suspended. Green was sentenced to six years' probation, four of which were supervised. The trial court also ordered Green to pay $4,140.21 in restitution, as well as costs and fees, complete 120 hours of community service, and receive a drug assessment and follow any resulting recommendations. Green challenges only two of his convictions on appeal. Green argues that the trial court erred in denying his motions to dismiss the charges of aggravated assault and first-degree terroristic threatening. We affirm.

On or about December 17, 2010, at approximately 7:30 p.m., Jim Biggs, an employee at the England Police Department, picked up Green on a warrant for failure to appear. When Biggs initially made contact with Green in order to transport him, Green was calm, but his demeanor changed once they got to Interstate 40. Biggs testified that, on the drive from North Little Rock, where Green was located, to England, Green's "attitude just continually got worse." Biggs testified that Green cursed and threatened to sue the Little Rock Police Department. Also, Biggs stated that Green had said that he "was going to blow Sergeant Mike Henry's mother-fucking head off." According to Biggs, "[o]ne minute [Green] would be fine, next minute he would be agitated." Biggs stated that he was familiar with Green from "a run in" long ago and that it was unusual for Green "to be snapping on and off like this." Given Green's behavior, Biggs took precautions before his arrival at the police department by requesting assistance from two other officers.

Christina Peebles, a dispatcher/jailer at the England Police Department, testified that it is unusual for an officer to request "backup" when bringing a suspect to the police department. The officers assisted Biggs in getting Green into a cell at the jail. Peebles stated that, once the cell door closed, Green "just went nuts." Green told Peebles that he knew where she lived and that he was going to kill her. Peebles testified that she took the threat seriously and was scared. Green also threatened other inmates at the jail.

Peebles further testified that Green screamed for hours, so much so that it made it difficult to hear the radio for dispatching. Green defecated in the cell's

sink, threatened to throw his feces on Peebles, and eventually smeared the feces on the wall of his cell. At one point, Peebles went to check on Green, and, when she stepped forward, Green spat on her. The spit hit the wall in front of the cell and landed on Peebles's shoe. At approximately 2:00 a.m., Peebles heard the sound of breaking glass coming from Green's cell. When Green was unsuccessful at luring Peebles back to the jail area, Green began throwing glass at the wall. Officers discovered that Green had ripped the toilet from the wall and broken the porcelain bowl. Peebles testified that she had received training on how to deal with angry prisoners and that she employed the methods she had learned on Green but that "[Green] was on something." According to Peebles, Green told other inmates that he had smoked "sherm."[1]

Herman L. Hutton, Jr., a certified law enforcement officer at the England Police Department, testified that England has a small jail. The cell that Green was originally placed in was damaged after Green flushed sheets down the toilet, causing it to overflow; broke the toilet and tore it from the concrete base; bent a metal partition by banging on it; and smeared feces on the wall. Due to the damage, Green was moved to another cell. Green's relatives arrived to visit him and attempted to calm him down, but they were unsuccessful. Green cursed at Hutton and tried to spit on him. Hutton testified that Green was eventually taken to the Pulaski County jail where he could be placed in an isolation cell. Hutton stated that the England jail had to be shut down, prisoners had to be released, and the water had to be shut off for several days while the damage was repaired. Hutton testified that he believed Green was probably under the influence of an intoxicant because Hutton "had never seen [Green] act that crazy before."

Christian Chaney, a certified law enforcement officer at the England Police Department, testified that he was on patrol when Peebles contacted him to request assistance with "an irate inmate." Chaney made contact with Green once Green had been placed into a cell, and Chaney testified that "[Green's] attitude would go from calm and understanding to irate and violent within just a matter of seconds." Green began kicking a metal partition separating the toilet area, and the concrete that formed the base of the partition broke loose from the floor. Chaney was standing against the cell bars, and Green lunged at Chaney, who then sprayed Green in the face with pepper spray, after which Green complied with Chaney's order to step away from the damaged partition. Chaney testified that he heard Green threaten Peebles by telling her that he knew where she lived and that he would kill her. Chaney stated that, when he returned to the jail the following day, there was water on the floor as a result of Green's destroying the toilet. Chaney testified that water had seeped into the dispatch and booking areas, which were carpeted, and had leaked through the walls toward the courtroom and out the back door. Chaney testified that, given his experience and training as a certified narcotics officer, he believed Green "was on something."

Michael Herron, enrolled at the Arkansas Law Enforcement Training Academy (ALETA), testified that he was summoned to the police department to deal with Green because he "kind of" knew Green. Herron testified that "the way I seen

---

**1.** "Sherm" is defined as a cigarette or joint dipped in Phencyclidine, more commonly known as PCP, which is then smoked. Urban Dictionary, *Sherm*, (April 27, 2012), http://www.urbandictionary.com/define.php?term=Sherm

[Green] at the jail, that was not the same Jackie that speaks to me on the streets." Herron's attempts to calm Green were unsuccessful, and Herron returned to patrol. About two hours later, Herron was again summoned to the jail in connection with Green's behavior. Herron saw the damage that[5] Green had caused to his cell and described Green as "kicking and spitting." Herron and another officer then transported Green to the Pulaski County jail. On the drive there, Green spat on the floor of the patrol car in the back seat and tried to spit through the cage barrier at the officers in the front seat. Herron stated that, "[Green] was kicking the window in the door as we were going down the highway."

Lieutenant Douglas Bjork at the England Police Department testified that, upon Green's arrival at the police department, Green stated that he was "going to kick our ass once these handcuffs are off of him." Bjork received reports on Green throughout the night. While Bjork was on a traffic stop, he radioed the dispatcher for information and heard Green yelling in the background. The following day, Bjork entered the cell to remove Green, but Green hid behind a barrier and refused to show his hands. Bjork testified that he had to employ his taser because Green came at him with a piece of the broken toilet in his hand and threatened to throw it if the officers came any closer.

After defense counsel's motions to dismiss were denied, Green took the stand and testified that he and his "old lady" were out shopping when he decided he wanted to get his warrant "taken care of" because he did not want to be incarcerated over Christmas. According to Green, he called officials in England about his charges on the day before he was to appear in court and on the day of court, but no one called him back. Green stated that he eventually called the police department

and surrendered voluntarily. Green explained that, because his vehicle was inoperable, the police transported him to England. Green testified that "things really did not get rowdy on the ride to England" and that he and Biggs simply had[6] a conversation. According to Green, "everything was cool" when he arrived at the police department. Green claimed that, when he was taken to a cell, he was "just carrying on" because he was not given another court date. By "carrying on," Green said that he was "cursing back" at Peebles, but he never threatened to harm her. Green testified that he was angry at Peebles and told her that her husband had left her because she was "sleeping around" and that as a result Peebles then "made this up about [Green]." Green stated that, although he spat on the wall in his cell, he did not spit on Peebles and did not spit in anyone's direction. According to Green, the concrete holding the partition was already cracked when he was put into the first cell, and he did not kick it loose. Green testified that he did not think there was anything wrong with the toilet when he left that cell. Green stated that the toilet in the next cell that he was moved to had a cracked lid, which broke when he slammed the lid. Green admitted flushing the sheets down the toilet and causing the cell to become flooded.

Green renewed his motions to dismiss at the close of evidence, and the trial court again denied those motions. Green argues on appeal that the trial court erred in denying his motions to dismiss with respect to his convictions for aggravated assault upon an employee of a correctional facility and first-degree terroristic threatening.

A motion to dismiss at a bench trial is identical to a motion for directed verdict at a jury trial in that it is a challenge to the sufficiency of the evidence.

*Springs v. State,* 368 Ark. 256, 244 S.W.3d 683 (2006). In reviewing a challenge to the sufficiency of the evidence, we will not second-guess credibility determinations made by the fact-finder. *Stone v. State,* 348 |₇Ark. 661, 74 S.W.3d 591 (2002). Rather, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm the conviction if there is substantial evidence to support it. *Wilson v. State,* 88 Ark.App. 158, 196 S.W.3d 511 (2004). Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty, without resorting to speculation or conjecture. *Id.*

A person commits aggravated assault upon an employee of a correctional facility if, under circumstances manifesting extreme indifference to the personal hygiene of the employee, the person purposely engaged in conduct that creates a potential danger of infection to the employee while the employee is engaged in the course of her employment by causing the employee to come into contact with saliva by purposely expelling the fluid. Ark.Code Ann. § 5–13–211(a) (Repl.2006).

■ Green's first point on appeal is that he did not cause Peebles, who is an employee of a correctional facility, to come into contact with his saliva because Green was merely spitting on the wall of his cell and Peebles stepped forward, resulting in some saliva landing on her shoe. Green claims that this action did not result in any potential danger of infection because Peebles wore a closed-toe shoe. Finally, Green maintains that there was overwhelming evidence that he was under the influence of an intoxicant and that, because section 5–13–211 requires a purposeful mental state, the defense of voluntary intoxication was available to him.

■ Because of the obvious difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. |₈*Watson v. State,* 358 Ark. 212, 188 S.W.3d 921 (2004). While Green maintains that he did not purposely cause his saliva to come into contact with Peebles, the evidence establishes otherwise. Hutton testified that Green attempted to spit on him, and Herron testified that Green spat through the cage barrier in the patrol car at him and another officer. Given Green's actions with regard to the law enforcement officers and the ALETA trainee, the jury could reasonably conclude that Green purposely caused his saliva to come into contact with Peebles. The fact-finder, who makes credibility determinations, obviously believed the testimony of Peebles, Hutton, and Herron and did not believe Green's testimony that Peebles walked into his stream of saliva that was aimed at the wall in front of his cell. *See Stone, supra.*

■ Green contends that his saliva came into contact with Peebles's closed-toe shoe, and therefore, there was no potential for infection. In *Foster v. State,* 104 Ark. App. 108, 289 S.W.3d 476 (2008), Foster argued that there was no evidence that he suffered from any infection at the time his saliva came into contact with a correctional facility employee and that he thus could not be found in violation of section 5–13–211 because the offense requires a danger of infection as one of the elements. In rejecting Foster's argument, this court noted that "Mr. Foster's act of purposely expelling his bodily fluid onto the deputy's person satisfied the 'potential danger' requirement of the offense." *Foster,* 104 Ark.App. at 112–13, 289 S.W.3d at 479. Likewise, Green purposely spat on Peebles creating a potential danger of infection,

regardless of where the saliva made contact with Peebles.

Green relies on *Davis v. State,* 12 Ark. App. 79, 670 S.W.2d 472 (1984), for the proposition that the defense of voluntary intoxication was available to him. Green's reliance is misplaced, as our supreme court declared, only two years after the decision in *Davis,* that voluntary intoxication is not a defense in criminal prosecutions. *See White v. State,* 290 Ark. 130, 717 S.W.2d 784 (1986) (taking the opportunity to "resolve the confusion" surrounding the defense of voluntary intoxication); *see also Lacy v. State,* 2010 Ark. 388, 377 S.W.3d 227; *Flowers v. State,* 2010 Ark. 364, 370 S.W.3d 228; *Miller v. State,* 2010 Ark. 1, 362 S.W.3d 264; *Standridge v. State,* 329 Ark. 473, 951 S.W.2d 299 (1997); *Caldwell v. State,* 322 Ark. 543, 910 S.W.2d 667 (1995); *Sullinger v. State,* 310 Ark. 690, 840 S.W.2d 797 (1992); *Spohn v. State,* 310 Ark. 500, 837 S.W.2d 873 (1992).

In his second point on appeal, Green again raises voluntary intoxication as a defense to his conviction for first-degree terroristic threatening, arguing that the State failed to prove that he acted with the purpose of terrorizing anyone, given that he was intoxicated. As stated earlier, the defense of voluntary intoxication is no longer available. *See White, supra.*

Affirmed.

ROBBINS and HOOFMAN, JJ., agree.