Dr. Alvernia stated that ten weeks was a reasonable amount of time to be off work under the circumstances. Because we have concluded that the Commission's decision under the preceding second point of appeal was supported by substantial evidence, it is clear that we must also affirm the award of temporary-total disability benefits for the period November 16, 2010, through February 7, 2011.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.

2012 Ark. App. 666

**L.C., Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA 12–278.**

Court of Appeals of Arkansas.

Nov. 28, 2012.

LaJeana Jones and Dorcy Kyle Corbin, Little Rock, Arkansas Public Defender Commission, for appellant.

Dustin McDaniel, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

LARRY D. VAUGHT, Chief Judge.

On January 10, 2012, in an amended disposition order, the juvenile division of the Circuit Court of Little River County found allegations of second-degree battery, a Class D felony, against L.C. to be true. The trial court committed L.C. to the Division of Youth Services (DYS), sentenced her to serve probation until her eighteenth birthday, and ordered her to pay restitution and court costs. On appeal, L.C. argues that: (1) the trial court erred in denying her motions to dismiss challenging the sufficiency of the evidence; (2) the trial court erred in denying her motion to dismiss based on a defective juvenile-delinquency petition; (3) the amended disposition order is void because the trial court interfered with DYS's exclusive release authority by requiring prerelease notice and

a hearing;[1] and (4) the trial court erred in committing her to DYS. We affirm.

The testimony at the hearing revealed the following facts. On July 11, 2011, L.C., who was sixteen years old and convinced that her boyfriend, A.H., had "cheated" on her, called Jamie Ardwin, a friend of A.H., to ask if A.H. had "cheated" on her. Jamie testified that he told L.C. that he believed A.H. had "cheated" on her. L.C. also made comments to Jamie that made him believe that A.H. had been "messing around" with Jamie's girlfriend. Then L.C. told Jamie that she wanted A.H. to be "beat up," and Jamie agreed to do it. L.C. said to Jamie that she was planning to see A.H. that night. They devised a plan wherein Jamie and his friends, D.D. and B.I., would pick up L.C. and A.H. and drive them to a parking lot near a lake. Once they arrived, Jamie and L.C. agreed to kiss to try to instigate a fight with A.H. They also planned to videotape the event. According to the evidence, L.C. initiated the plan to beat A.H., and all four individuals—L.C., Jamie, D.D., and B.I.—were aware of and discussed the plan.

According to A.H.'s testimony, his girlfriend L.C. contacted him on July 11, 2011, and told him that they were going to "hang out" with some friends that night. A.H. said that Jamie, B.I., D.D., and L.C. picked him up and drove him to the dam near the lake. B.I. took video, which was introduced into evidence, that showed Jamie and D.D., prior to the fight, introducing themselves and showing off their muscles. There is also video of L.C. and A.H.

kissing, after which Jamie is seen walking up to L.C. and kissing her, with A.H. standing nearby watching. After he kissed L.C., Jamie immediately turned around and punched A.H. in the face, and a fight between them ensued.[2] Once the fight started, D.D. immediately jumped in and punched A.H. in the head, and L.C. walked out of view of the camera.

During the fight, blood can be seen running down A.H.'s head, neck, and back. Hearing testimony established that D.D. used brass knuckles to strike A.H. in the head, and in the video, Jamie can be seen picking them up off the ground. The parties eventually separated and can be seen yelling at each other. Finally, A.H. walked away, and Jamie, D.D., B.I., and L.C. left in the vehicle they arrived in. A.H. called for help and was given a ride to the hospital by another friend who happened to be nearby. At the hospital, doctors found that A.H. had four scalp lacerations, which were closed with thirteen surgical staples. He received no other medical treatment for his injuries.

B.I.[3] testified that he, L.C., Jamie, and D.D. devised a plan to fight A.H. He said the others had been working on the plan for a couple of hours, and he was brought into the plan at the last minute to drive the group and to record the fight on video. The signal for B.I. to start the camera was when Jamie kissed L.C. B.I. testified that brass knuckles were used in the fight against A.H., but he was not aware of who brought them to the fight or who used them on A.H.

1. The Arkansas Department of Human Services (DHS) has filed an amicus curiae brief, arguing that the amended disposition order is void for the same reason.

2. For his role in the fight, Jamie, in a separate proceeding in circuit court, pled guilty to second-degree battery. He was sentenced to six years' imprisonment in the Arkansas Department of Correction, with four years suspended.

3. In a separate juvenile proceeding, B.I. pled true to the delinquency petition filed against him, alleging he committed the offense of second-degree battery in connection with the beating of A.H.

The incident was investigated by Little River County Sheriff Glen Hawkins. As part of his investigation, Hawkins interviewed L.C., who gave two written statements. In her first statement, she said that she, Jamie, D.D., and B.I. took A.H. to Millwood "with intentions of beating him up." She said that they parked under a light so that the attack could be filmed. She said that the plan was that Jamie would kiss her, hoping to make A.H. mad so that he would start the fight. When he did not, Jamie punched A.H. in the face. D.D. jumped in and helped Jamie. She said that during the fight she went to the vehicle so that she would not have to watch. However, she added that she watched the video of the fight and could see brass knuckles were used on A.H. She said that they could be seen falling to the ground during the fight. In her second statement, L.C. said that she was aware of two knives and two brass knuckles that were in the vehicle prior to the fight, but that she told the boys she did not want them used. L.C. also told Hawkins that she was aware of the plan to beat up A.H. and that she participated in the plan by getting A.H. to the place where he was to be beaten.

At the close of the State's evidence, L.C.'s counsel moved for dismissal, arguing that the petition filed against L.C. was defective because it failed to include the particular type of second-degree battery that L.C. allegedly committed and because it did not cite the accomplice statute. L.C.'s counsel also argued that there was insufficient evidence to support a second-degree-battery disposition because "there is no proof that [L.C.] caused any injury on anybody and the statute clearly specifies that the person charged has to cause that injury. [L.C.] didn't cause anything." The trial court denied the motions. The defense rested and renewed its motions, adding "[L.C.] did not cause any serious physical injury to anybody." In response, the trial court found that the allegations in the petition against L.C. were true. The trial court further found that (1) there was evidence that L.C. initiated the plan to beat A.H., she called A.H. and set him up for the meeting; (2) she gave a statement to law-enforcement officials that she and her friends picked up A.H. with the intention of beating him; (3) she told another witness that she wanted A.H. beaten up; (4) the victim suffered four scalp lacerations that were treated by thirteen staples, which was a serious physical injury; and (5) L.C. acted with the culpable mental state sufficient for the commission of the offense and she caused or encouraged another person to engage in conduct that would constitute that offense.

The parties then presented sentencing witnesses. The first was Elaine Ashley, a juvenile-probation-intake officer, who testified that it was her recommendation that L.C. be committed to DYS, placed on probation until her eighteenth birthday, and ordered to pay restitution and court costs. She added that she originally recommended that L.C. be placed on probation but changed her recommendation after learning from the prosecutor's office that they would not follow that recommendation. Ashley said that L.C. had no prior delinquency charges filed against her.

Bryan Ledford, the principal of L.C.'s high school in Ashdown, testified that L.C. had acceptable attendance and that she was a good student, who took advanced classes and maintained a 3.16 grade-point average. While he said that she had no disciplinary referrals in her file for the current year, the year before she authored a "hit list," which was a list of people from school that she wanted to hurt or "get back at." Ledford said that as a result, he spoke with L.C. and her parents, and no-

contact orders were placed between L.C. and the students on the list.

The director of a youth-services program at Southwest Arkansas Mental Health, Wayland Lovell, testified about the types of services offered to juveniles sentenced to probation as compared to those committed to a detention center. He opined that it is best to keep juveniles out of the detention centers (like DYS) because they are overcrowded and juveniles will receive no services. He opined that if a juvenile is doing well in school and hopes to go to college, then a commitment to DYS would be a setback. He suggested that a good student should be placed on probation where she can be ordered to perform community service, regularly visit a probation officer, attend school, and abide by a curfew.

Scott Tanner, the coordinator of the Juvenile Ombudsman Division of the Public Defender Commission, testified that his division was created by the General Assembly to monitor the conditions at DYS and advocate for the best interest of the youth that are remanded there. His duties include investigating, reporting, and addressing complaints and concerns raised by juveniles, or anyone associated with the juveniles, who have been remanded to DYS. His testimony was that it would be difficult for a good student taking advanced classes like L.C. to be able to continue that level of education in a detention center. He stated that forty percent of the youth committed to DYS are identified as special-education students, where the average age is sixteen and the average reading level is third grade. He said that DYS is not prepared to help an honor student continue her education and that the best students can hope for at DYS is a GED.

L.C.'s mother, Candice Carver, testified that she and her husband did not approve of the relationship between L.C. and A.H. and that she was not permitted to leave the house with him. Carver said that on the night of the attack, L.C. left home without permission. After the incident with A.H., Carver and her husband punished L.C. by confining her to their home and placing her under their constant supervision, not allowing her to attend any after-school functions unless they were with her, requiring her to work more around the house, not furnishing her a phone, and not permitting her to drive or visit with friends. Carver was worried about L.C. being committed to DYS because it would take her away from her younger brother and it would also negatively affect her education. She believed that L.C. had learned from her mistake and that it would not be in her best interest to go to DYS.

The final sentencing witness was Brady Baker. Baker testified that she has two children, one who is blind, and that L.C. helped care for them. When Baker had surgery, L.C. stayed in Baker's home overnight for two and a half weeks. Baker testified that L.C. often stays the night and/or weekend with her or her mother, Marti Brunson, but that there is an adult supervising L.C. at all times.

At the conclusion of the sentencing phase, the trial court found that probation was "light," and was not the proper disposition. As such, the trial court committed L.C. to DYS, probation until her eighteenth birthday, and ordered her to pay restitution and court costs. The trial court stated that L.C. had committed a very serious offense; that the victim could have died; that one of the individuals involved was sentenced to the penitentiary; and that L.C. had had prior problems at school that demonstrated some anger-management issues. On December 13, 2011, two orders formalizing these findings were en-

tered: a DYS commitment order and a disposition order. The trial court amended the DYS commitment order on December 19, 2011, and amended the disposition order on January 10, 2012. L.C. filed a timely notice of appeal.

We first address L.C.'s argument that the trial court erred in denying her motions to dismiss her second-degree-battery disposition. A motion to dismiss at a bench trial is identical to a motion for directed verdict at a jury trial in that it is a challenge to the sufficiency of the evidence. *Green v. State*, 2012 Ark. App. 315, at 6, 416 S.W.3d 765, 768. The test for determining sufficient proof is whether there is substantial evidence, direct or circumstantial, to support the verdict. *Harmon v. State*, 340 Ark. 18, 22, 8 S.W.3d 472, 474 (2000). On appeal, we review the evidence in the light most favorable to the State and sustain the conviction if there is any substantial evidence to support it. *Harmon*, 340 Ark. at 22, 8 S.W.3d at 474. Evidence is substantial if it is forceful enough to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.*, 8 S.W.3d at 474. In determining whether there is substantial evidence, we consider only that evidence tending to support the verdict. *Id.*, 8 S.W.3d at 474. We do not weigh the evidence presented at trial, as that is a matter for the fact-finder. *Id.*, 8 S.W.3d at 474–75. Where, as here, the trial is before the bench, the trial judge sits as fact-finder. *Id.*, 8 S.W.3d at 475.

A person commits second-degree battery if:

(1) With the purpose of causing physical injury to another person, the person causes serious physical injury to any person;

(2) With the purpose of causing physical injury to another person, the person causes physical injury to any person by means of a deadly weapon other than a firearm;

(3) The person recklessly causes serious physical injury to another person by means of a deadly weapon; . . . .

Ark.Code Ann. § 5–13–202(a)(1)–(3) (Repl. 2006).

Under this point, L.C. makes two arguments. She first contends that there was a lack of evidence demonstrating that A.H. suffered a serious physical injury because his life was never in danger, he walked away from the fight, and he suffered no long-term side effects from his injury. Her second argument is that because her plan did not include A.H. being beaten up by D.D., with or without brass knuckles, she did not have the culpable mental state to commit the offense of second-degree battery. She points to evidence that she did not talk to D.D. about the plan, that D.D.'s punches (not Jamie's) injured A.H., and that the plan was to be limited to some "high school drama."

However, because L.C. did not make these arguments at trial, they are not preserved for appeal. At trial, counsel for L.C. argued that there was insufficient evidence to support a second-degree-battery disposition because "there is no proof that [L.C.] caused any injury on anybody and the statute clearly specifies that the person charged has to cause that injury. [L.C.] didn't cause anything." It was also argued that "[L.C.] did not cause any serious physical injury to anybody."

In order to preserve a challenge to the sufficiency of the evidence in a bench trial, a criminal defendant must make a specific motion for dismissal or for directed verdict at the close of all evidence. *Colgan v. State*, 2011 Ark. App. 77, at 1, 2011 WL 386961; (citing Ark. R.Crim. P. 33.1(b)–(c) (2010)). Rule 33.1 reads in pertinent part:

(b) In a nonjury trial, if a motion for dismissal is to be made, it shall be made at the close of all of the evidence. The motion for dismissal shall state the specific grounds therefor....

(c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or |₁₀judgment. A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense....

Ark. R.Crim. P. 33.1(b)–(c) (2011). The rationale behind this rule is that "when specific grounds are stated and the absent proof is pinpointed, the circuit court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof." *Maxwell v. State*, 373 Ark. 553, 559, 285 S.W.3d 195, 200 (2008). Without a trial court ruling on a specific motion, there is nothing for this court to review. *Id.*, 285 S.W.3d at 200.

In the instant case, counsel for L.C. failed to make the specific motions regarding lack of evidence to prove serious physical injury and the lack of evidence to prove culpable mental state. Accordingly, the sufficiency arguments she now asserts on appeal are not preserved for our review. The only sufficiency argument preserved for appeal is that "there is no proof that [L.C.] caused any injury on anybody." On this point we disagree.

In cases where the theory of accomplice liability is implicated, we affirm a sufficiency-of-the-evidence challenge if

substantial evidence exists that the defendant acted as an accomplice in the commission of the alleged offense. *Clark v. State*, 358 Ark. 469, 475–76, 192 S.W.3d 248, 252 (2004). A person is criminally liable for the conduct of another person when he is an accomplice of another person in the commission of an offense. *Clark*, 358 Ark. at 476, 192 S.W.3d at 252 (citing Ark.Code Ann. § 5–2–402(2) (Repl.1997)). The accomplice-liability statute, set forth in Ark. Code Ann. § 5–2–403, provides that:

(a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person:

|₁₁(1) Solicits, advises, encourages, or coerces the other person to commit the offense;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense; ...

(b) When causing a particular result is an element of an offense, a person is an accomplice of another person in the commission of that offense if, acting with respect to that particular result with the kind of culpable mental state sufficient for the commission of the offense, the person:

(1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the particular result;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the particular result;....

Ark.Code Ann. § 5–2–403(a)(1)–(2), (b)(1)–(2) (Repl.2006). Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity of a crime, the opportunity to commit the crime, and an association with

a person involved in a manner suggestive of joint participation. *Clark,* 358 Ark. at 476, 192 S.W.3d at 253. Under the accomplice-liability statute, a defendant may properly be found guilty not only of his own conduct, but also the conduct of his accomplice; when two or more persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.,* 192 S.W.3d at 253. Finally, there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.,* 192 S.W.3d at 253.

In the case at bar, we hold that there is substantial evidence supporting L.C.'s second-degree-battery disposition based on her accomplice liability. Jamie testified that L.C. solicited and encouraged the plan to beat A.H. The evidence established that all parties involved in the attack were aware of the plan. L.C.'s own statement to law-enforcement officials was that she, Jamie, D.D., and B.I., drove A.H. to the lake "with the intentions of beating him up." A.H. testified that L.C. aided in the plan by setting him up for the attack by telling him that they were going out with Jamie, D.D., and B.I. that night. She also participated in the plan by engaging in a staged kiss with Jamie.

Because there is overwhelming evidence that Jamie, D.D., B.I., and L.C. assisted one another in the commission of the second-degree battery against A.H., each is an accomplice and criminally liable for the conduct of the others. As set forth in *Clark,* there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Clark,* 358 Ark. at 476, 192 S.W.3d at 253.

While L.C. contends that D.D. was not a part of her plan and that he only entered the fight to come to the aid of Jamie, there is evidence to the contrary. The video shows both Jamie and D.D., before the fight, introducing themselves to the camera and flexing their muscles. The video also shows D.D. entering the fight after Jamie launched the first punch. L.C. also claims that brass knuckles were not a part of her plan; however, there was evidence that she knew that there were two pairs of brass knuckles and two knives in the vehicle prior to the fight. In one of her statements, she said that while she was in the vehicle during the fight, she only saw the two knives, and there is no evidence that L.C. tried to stop the fight. Therefore, while L.C. was not the party who wore the brass knuckles and threw the punches causing multiple scalp lacerations to A.H., under the accomplice-liability statute, she may properly be found guilty not only of her own conduct, but also the conduct of her accomplices, who in this case carried out those actions. Thus, we affirm L.C.'s second-degree-battery disposition.

L.C. also contends that the trial court erred in denying her motion to dismiss based on deficiencies in the prosecutor's delinquency petition.[4] The petition alleged that L.C. committed second-degree battery, pursuant to Ark.Code Ann. § 5–13–202, and further stated that she "did admit to being responsible for setting up the assault on [A.H.]" L.C. argues that petition is deficient because it failed to state any facts that would notify her that a second-degree battery occurred, and it failed to set forth all sections of the criminal law allegedly violated, as required by Ark.Code Ann. § 9–27–311(d)(1)(D), when

---

4. The delinquency petition is the charging instrument in a juvenile proceeding. Ark.

Code Ann. § 9–27–310(a) (Repl.2009).

it did not cite the accomplice-liability statute found in Ark.Code Ann. § 5–2–403 (Repl.2006). We do not address the merits of these arguments because they are not preserved for appeal.

The first time counsel for L.C. made these arguments was at trial *after* the State rested its case. Our supreme court has held that the proper time to object to the form or sufficiency of an indictment or information is prior to trial. *Threadford v. Hobbs,* 2011 Ark. 468, at 3, 2011 WL 5248224 (per curiam); *Barnes v. State,* 94 Ark.App. 321, 325, 230 S.W.3d 311, 315 (2006). We have declined to review the sufficiency of an information on appeal when there was no proper objection in the court below. *Threadford,* 2011 Ark. 468, at 3, 2011 WL 5248224. Because L.C. failed to object prior to trial, her challenges are barred. *Barnes,* 94 Ark.App. at 325, 230 S.W.3d at 315.

■ Next, L.C. argues that the amended disposition order is void because the trial court interfered with DYS's exclusive release authority by requiring prerelease notice and a hearing. Specifically, L.C. challenges the following language in the amended disposition order: "Prior to being released from the Division of Youth Services, DYS shall notify this court in order that a hearing can be scheduled in Little River County." Citing Arkansas Code Annotated section 9–27–331(a)(5) (Repl. 2009),[5] L.C. argues that DYS has the sole authority to release a child who is not an extended-juvenile-jurisdiction offender, and the trial court's interference

violates the Separation of Powers Doctrine.[6]

We hold that this issue is moot because counsel at oral argument confirmed that L.C. had been released from DYS custody. Although DHS asks us to reach the merits of the issue because, according to its data, the language to which it objects is inserted into DYS commitment orders in at least one-quarter of its cases, we decline to do so. DHS admitted in its brief that it routinely notifies the trial court prior to a juvenile's release. In the case at bar, DYS provided notice of L.C.'s release, and she was released with no hearing being held.

■ For her final point on appeal, L.C. contends that the trial court erred by committing her to DYS, arguing that the trial court failed to consider her best interests, the public welfare, and the least restrictive alternative as required by Ark.Code Ann. § 9–27–329(d) (Repl.2009). She points out that the intake officer recommended that L.C. be committed to DYS because the prosecutor's office refused to follow her original recommendation of probation. L.C. also cites to evidence that she is an honor student with a 3.16 GPA, who was on schedule to graduate early from high school; that she had no prior delinquencies; and that a commitment in DYS would negatively affect her education. Finally, she argues that the DYS commitment was error when there was evidence of alternative dispositions available, such as probation, community service, psycho-

5. Arkansas Code Annotated section § 9–27–331(a)(5) provides: "The length of stay and the final decision to release shall be the exclusive responsibility of the division, except when the juvenile is an extended juvenile jurisdiction offender."

6. The amicus curiae brief filed by DHS also contends that the language in the order un-

lawfully restrains its agency (DYS) in the exercise of its executive authority. DHS argues that "prerelease notice and hearing requirements disrupt [the] statutory scheme and place DYS in an untenable position with respect to providing services to all of the juveniles charged to its care."

logical evaluations, and suspended driving privileges.

While this issue may be moot based on the concession at oral argument that L.C. had been released from DYS custody, we nevertheless affirm the trial court's DYS commitment decision in this case. The trial court's decision is consistent with the ultimate recommendation of the intake officer, who concluded that commitment to DYS was appropriate in this case. Moreover, the trial court's ruling demonstrates that it considered the alternative dispositions available and L.C.'s best interest. As evidenced by its statements at the conclusion of the sentencing phase of the case, the trial court acknowledged that each party made good points, and it weighed the evidence, finding that probation was not the proper disposition. The trial court found that L.C. committed a serious offense and that the victim could have died as a result. According to the trial court, this incident, coupled with L.C.'s school "hit list," demonstrated that she had anger-management issues in need of treatment. Therefore, we hold that the trial court did not err in committing L.C. to DYS.

Affirmed.

WYNNE and BROWN, JJ., agree.